487 A.2d 1228

**Patrick Larell ALFRED**

v.

**STATE of Maryland.**

**No. 667, Sept. Term, 1984.**

Court of Special Appeals of Maryland.

Feb. 14, 1985.

648

650

Michael Elder, Assigned Public Defender, Baltimore (Alan H. Murrell, Public Defender, Baltimore, on brief), for appellant.

Diane G. Goldsmith, Asst. Atty. Gen., Baltimore (Stephen H. Sachs, Atty. Gen., Baltimore, Andrew L. Sonner, State's Atty. for Montgomery County and Paul S. Lewis, Asst. State's Atty., for Montgomery County, Rockville, on brief for appellee.

Argued before MOYLAN, ADKINS and BLOOM, JJ.

MOYLAN, Judge.

For all of the Supreme Court's commendable movement toward general reasonableness as a realistic touchstone of Fourth Amendment propriety, there is still no such thing as a legitimate investigatory arrest or a legitimate frisk incident to a consensual trip to the station house. With that brief prologue, we turn our attention to the conviction of the appellant, Patrick Larell Alfred, by a Montgomery County jury for theft. The sole issue before us on this appeal is the failure of a pretrial hearing judge to grant the appellant's motion to suppress a small gold chain and a silver brooch taken from the appellant's rear pants pocket a little more than one hour after the theft occurred.

The seizure of these two items of stolen jewelry hangs by a chain of justification consisting of five separate links, no one of which is more than modestly adequate and several of which are structurally flawed to the constitutional breaking point. To support its ultimate burden, the State must establish the sustaining adequacy of each of five propositions:

1) That there was articulable suspicion for the stop of the appellant as of the very inception of that stop;

2) That the stop, even if properly initiated, was not, in terms of its duration, unreasonably excessive in scope prior to the critical frisking;

3) That there was articulable suspicion for the frisk;

4) That the frisk was truly an incident of the stop and not an incident to a consensual trip to the station house; and

5) That the frisk remained appropriately limited in scope to an actual probe for offensive weapons and did not degenerate into a search for and seizure of suddenly suspected stolen goods.

## THE STOP

The initial police response in this case was alert, intelligent, and highly commendable in every way; it simply became a bit unravelled (in the constitutional sense, not in the investigative sense) as the evening wore on.[1] The real dilemma, *vis-à-vis* this appellant, was that the police were walking the razor's edge, having too much (in their judgment) to let him go but not having enough to hold him further. They were required to respond in black or white, when their legitimate investigative senses perceived only gray. The hard reality is that they are not permitted to equivocate even when all the surrounding circumstances are equivocal.

The victim, Norma Solis, was watching television in her Pear Tree Lane apartment, when she heard noises from her bedroom as if venetian blinds were rattling. Thinking that she had shut the bedroom window, she went to investigate. She discovered the top of one of her jewelry boxes on the floor and a second jewelry box, normally sitting on a

---

1. This case raises yet again the age-old question of the efficacy of the Exclusionary Rule, depending as it does upon the few who are guilty to vindicate the constitutional freedoms of the many who are innocent. In an effort to prevent the escape of suspected fleeing felons, the police hurriedly cast a dragnet over a neighborhood. A dragnet of almost one mile in radius imposed upon a well-populated area of suburban Silver Spring for every black male found within its compass was simply too broad in sweep. In a more ideal scheme of things, however, it would seem more appropriate for an innocent citizen caught up in that dragnet to bring a sanction, perhaps by way of civil suit, to bear upon the police authorities than for a guilty person caught in the dragnet to become an undeserving instrument in the service of a cause far nobler than his.

dresser right under the open window, missing. She immediately called the police, reporting a burglary and describing items of missing jewelry. The time was about 10:30 p.m.

At least three police cruisers responded to the scene within minutes. Officer Thomas Abbamonte was in the lead cruiser. As he turned from Connecticut Avenue into a relatively large apartment complex, which contained the victim's apartment house, he observed a Datsun, occupied by three or four black males, leave the apartment complex at a higher than normal rate of speed. The execution of a "U" turn presented a difficult maneuver. Word was passed back to the third cruiser in the convoy, driven by Officer Thomas Scafide, to go in pursuit of the Datsun. There is no quarrel with this judgment to trail and stop the Datsun; it was alert police work.

By the time that Officer Scafide negotiated his "U" turn and began the pursuit southbound on Connecticut Avenue, the Datsun had made a right-hand turn on Grand Pre Road and disappeared from Officer Scafide's view. When, moments later, he turned north on Grand Pre Road, the Datsun was out of sight. Within blocks, however, he found the Datsun, unoccupied but with its motor still running, at the side of the road. There was no key in the ignition; it had been hot-wired. A radio check soon revealed that it had been stolen from the Seabrook area of Prince George's County. Officer Scafide, shortly reinforced by other officers, began combing the area for three or four young black males. A neighboring resident, walking his dog, reported to one of the officers that he had just seen a young black male, dressed in a green hospital gown and cut-off shorts, run from the vicinity of the abandoned automobile into an apartment development across the street.

The police had this information when a few minutes later, Samuel Hall, a black male, came jogging by in a green hospital gown and cut-off shorts. After an unassailable *Terry* -stop, brief questioning revealed that Hall was from the same neighborhood in Prince George's County from

which the Datsun had been stolen. Minutes later, Jeffrey Jones, a black male, came walking by and was similarly stopped. He also gave the Seabrook area of Prince George's County as his address. The explanations of both Hall and Jones as to what they were doing in the neighborhood and particularly why Hall was out jogging were classically unsatisfactory. The detention of both, under the general guidelines of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and *Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), was beyond reproach, but those stops are not dispositive of the constitutionality of the later stop of the appellant. At that point, however, the police were still legitimately scouring the surrounding area for one, or perhaps two, other black males.

The entire case hinges exclusively on the judgment made approximately ten minutes later and approximately one mile (by road) away by Officer Charles Penney. He was driving northbound on Georgia Avenue when he saw the appellant and Anthony Alexander, both black males, walking southbound on Georgia Avenue and just about to cross Ralph Road. He stopped them, thereby initiating a process that soon involved a number of other officers and that culminated between 45 minutes and an hour later when Officer Abbamonte searched the appellant's pants pocket and recovered the two items of stolen jewelry.

For reasons to be discussed in a moment, we hold that this was the critical instant when a *Terry*-level stop, requiring no less than articulable and particularized suspicion, and not a mere accosting, requiring no Fourth Amendment justification, occurred. If it had been a mere accosting, of course, Officer Penney would have required no justification at all under the Fourth Amendment, for the gears of the Fourth Amendment would not even have been engaged. *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229, 236 (1983), was very clear in this regard:

"[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions."

In the case at bar, however, both the police testimony and the State's argument are framed in terms of justifying Officer Penney's encounter with the appellant and Alexander as a legitimate stop at its very inception. It has never been urged, at the suppression hearing or on appeal, that the initial encounter was a mere accosting and that certain responses elicited and observations made in the course of that mere accosting contributed to the articulable suspicion for what only ripened into a *Terry* -level stop at some short time thereafter. It appears very clear that neither the appellant nor Alexander felt free utterly to ignore Officer Penney's questions and simply to walk upon their way. It appears equally clear that Officer Penney did not contemplate any such prerogative on their part. The line between a mere accosting and a stop based on police authority is a constitutional watershed, as *Florida v. Royer*, at 460 U.S. 497–498, 103 S.Ct. at 1324, made unequivocally clear:

"The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way.... He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds." (Citations omitted).

The only basis that Officer Penney had for making a *Terry* stop of the appellant and his companion, at the very inception of that stop, was that they were two black males within less than a mile of an automobile that had been abandoned by three or four black males approximately ten minutes before. As we analyze these proximities of time and space, it is clear that the relevant epicenter was the

spot on Grand Pre Road where the Datsun was abandoned and not the apartment on Pear Tree Lane that had been burglarized. The presence of two black males within a circle of almost a mile in radius would have little significance if that circle were imposed upon a densely populated and essentially all black neighborhood; the same presence in rural Finland might have far greater significance. Obviously, the demographics of this centrifugal force field could have some bearing on the probabilities which are offered as the basis for a stop. The State, which bears the burden of justifying warrantless activity, offered no direct evidence on the demographics.

The indirect demographic clues argue against the State's position. The two suspects—Hall and Jones—who were picked up near the abandoned Datsun made reference to the nearby home of the aunt or grandmother of Jones. Hall, moreover, took the police to the home of a Mr. Hill in the 3200 block of Pear Tree Court, where all of the young men had been visiting earlier that evening. Officer Penney, before stopping the appellant and Alexander, had stopped in a 7–11 Store situated between the abandoned Datsun and the spot where the appellant was first observed. He described five or six young black males who were in the 7–11, whom he cleared of suspicion because the proprietor vouched for their presence there through most of the evening. Officer Penney also described several commercial establishments in the immediate area—a Dart Drug Store and a K-Mart.

■ The whole point is that a large area of relatively well populated suburbia lay within the suspect perimeter; and within that perimeter, there was nothing unusual about the presence of a black male. Under the circumstances, we find that the initial stop was no more than an "inchoate and unparticularized suspicion or 'hunch.' " *Terry v. Ohio, supra,* at 392 U.S. 27, 88 S.Ct. 1883.

■ The State argues that the gash (per Officer Penney) or the gouge (per Officer Abbamonte) observed on the

ankle of Alexander contributed to the accumulation of articulable suspicion.[2] The problem with the argument is that the observation of the ankle wound was not something that preceded the stop but rather something that occurred during the course of the stop. The State argues that the evasive answers given by the appellant and Alexander contributed to articulable suspicion. Once again, the evasive answers were a product of the stop, not a predicate for the stop. The State argues that the fact that the appellant and Alexander were from the Seabrook vicinity in Prince George's County had strong relevance. Of course it did; but, once again, that fact was a product of the stop, not a predicate for the stop. The State may no more justify a stop by what develops in the course of the stop than it may justify a search by what it finds in the course of the search.

Even if, for the sake of argument, we were to assume that the initial encounter between Officer Penney and the appellant was a mere accosting and that that encounter did not ripen into a *Terry* stop until after the ankle wound had been observed, the evasive nature of the answers had been noted, and the link to Seabrook had been established, the State still will have surmounted only the least of its hurdles.

### THE SCOPE OF THE STOP

The establishment of a sufficiently individualized and articulable suspicion to believe that the appellant, and his companion, had recently been involved in a crime, would serve only to justify the stop at its moment of inception. There remains the problem of its scope. As *Terry v. Ohio, supra,* at 392 U.S. 19, 88 S.Ct. 1878, made clear, the scope of the stop "must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." The Supreme Court has been emphatic that the manner and scope of a stop are "as vital a part of the inquiry" as

---

**2.** The State's theory is that Alexander suffered a puncture wound to his ankle when climbing over a chain link fence that lay athwart the overland short-cut from the abandoned Datsun to Georgia Avenue.

whether the stop was "warranted at all." The Supreme Court, at 392 U.S. 28–29, 88 S.Ct. 1883–1884, discussed in detail this issue of the permitted scope of the intrusion:

"The Fourth Amendment proceeds as much by limitations upon the scope of governmental action as by imposing pre-conditions upon its initiation.... The entire deterrent purpose of the rule excluding evidence seized in violation of the Fourth Amendment rests on the assumption that 'limitations upon the fruit to be gathered tend to limit the quest itself.' ... Thus, evidence may not be introduced if it was discovered by means of a seizure and search which were not reasonably related in scope to the justification for their initiation." (Citations omitted).

The entire rationale for permitting a Fourth Amendment intrusion on a predicate less substantial than probable cause is that the intrusion is fundamentally minimal. The conclusion that a stop is a slight or minimal, albeit reviewable, intrusion rests in large part upon the anticipated brevity of its duration. *Florida v. Royer, supra,* addressed this very issue, at 460 U.S. 500, 103 S.Ct. 1325:

"The predicate permitting seizures on suspicion short of probable cause is that law enforcement interests warrant a limited intrusion on the personal security of the suspect. The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case. This much, however, is clear: an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop."

■ As we measure in this case the reasonableness not of the stop, but of the *scope* of the stop, the burden of proving that reasonableness is clearly allocated to the State:

"It is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure."

*Id.*

Just as Officer Penney was the key actor in our assessment of reasonableness of the initiation of the stop, Officer

Abbamonte became the key actor in our assessment of the reasonableness of its duration. He was on Grand Pre Road with the abandoned Datsun and with the recently detained Hall and Jones when word came over the police radio that Officer Penney had stopped two other individuals on Georgia Avenue. Officer Abbamonte left Grand Pre Road immediately and headed for Georgia Avenue, arriving several minutes later. Before he began his interrogation of the appellant and Alexander, it is to be noted that the status of the stolen Datsun had already been learned and that responses from Hall and Jones as to their identities and their residences had already been elicited.

From the initial detention of the appellant by Officer Penney until the critical search of his hip pocket here in issue, between 45 minutes and one hour elapsed. The arrest, which immediately followed the search of the hip pocket, was at 11:30 p.m.

We see no remote justification for a detention of that length. The limited purpose of the stop was clear. As Officer Abbamonte explained:

"I asked them general questions, such as, what are you doing here? Where are you from? Where are you going to? Where have you been; to which they responded."

Officer Abbamonte in short order received his answers:

"They explained to me that they were from the Lanham-Seabrook area; that they had been out partying. They had been hitchhiking. They were on their way home. I asked specifically, the other subject, Mr. Alexander, how he had cut himself. It was an impaling type cut—a hole into the ankle.

He said that he had fallen off the curb."

As Officer Abbamonte himself concluded, he did not have probable cause to arrest the two:

Q: "As a result of that conversation and that obvious physical observation of Mr. Alexander, what if any—did you place the defendants under arrest at that time?

A: No.

Q: Why not?

A: I did not have probable cause to place them under arrest. There was no reason to believe that they were involved at that time."

Notwithstanding his acknowledged lack of probable cause to make an arrest, Officer Abbamonte proceeded to give the *Miranda* warnings which he himself admitted are associated with being placed in custody:

Q: What did you do, then?

A: At that time, I advised them both that, again, we had a problem; that they matched what we were looking for; that there was a problem in the area and that I wished to talk to them and advised them together, in unison, of their rights, verbally."

Paradoxically, even as Officer Abbamonte disclaimed any justification for arresting the two, he began taking the very steps that are associated with arrest.

■ One characterization of the encounter, given by the police as they attempted to explain what they were doing over this protracted period of time, strikes us as absolutely bizarre. They claim that they and the two detainees were, for a large part of the time, just "chatting." Although in an encounter such as this, the contending parties might conceivably "chat" if they were required to kill time, in a holding period waiting for something else to happen, that was not the situation at bar. The only extrinsic happening that occasioned any waiting at all was a radio check on the appellant and Alexander to see if they had criminal records. Although on cross-examination Officer Abbamonte responded that such a check could sometimes take up to three hours, Officer Penney responded that on this occasion, it took no more than several minutes. The checks, moreover, showed that the two detainees were "clean." Under the circumstances, we can see no justification for holding two individuals on a suburban Washington street corner at 11

o'clock at night for almost an hour for the purpose of "chatting." [3]

What almost certainly happened is clear. The officers asked their questions and got their answers, but they didn't like the answers. That frequently happens. Theirs, however, was the moment of decision. They had to decide whether to escalate the encounter to a higher plane or to terminate it. Instead of doing either, they simply prolonged the intermediate stage beyond that time necessary to serve its initial and limited purpose.

In a custodial setting following formal arrest, a painstaking and persistent "grilling" of a suspect is not necessarily inappropriate. That is a context in which a skeptical interrogator may demand that a shaky story be repeated again and then again, may point out inconsistencies, may probe for *non sequiturs,* and may demand explanations. The mood and especially the duration of a formal interrogation, however, are not the appropriate characteristics of the less intrusive, brief detention contemplated by *Terry v. Ohio.*

Almost precisely the same hard choice was facing Florida drug investigators in the case of *Florida v. Royer, supra.* They engaged the suspect, Mark Royer, in a brief encounter in a public concourse of the Miami Airport, which the Supreme Court found to be initially justified under *Terry v. Ohio.* There, as here, the police were not satisfied with the answers they received in the course of the *Terry* stop. Royer "had attempted to explain the discrepancy." 460 U.S. at 502, 103 S.Ct. 1326, 1327. "The officers were not satisfied." *Id.* "What had begun as a consensual inquiry in a public place had escalated into an investigatory procedure in a police interrogation room, where the police, unsat-

---

**3.** The choice of verbs does strain credulity. Webster's Third New International Dictionary (Unabridged, 1969) defines the intransitive verb "chat" as "to chatter; to prattle; to talk in a light and familiar manner; to converse without ceremony or stiffness." One could as likely picture Joan of Arc "chatting" with her accusers or Jean Valjean "chatting" with Inspector Javert.

isfied with previous explanations, sought to confirm their suspicions." *Id.* at 503, 103 S.Ct. 1327.

In *Florida v. Royer,* even though the police sought to justify the entire encounter as a mere *Terry* -type stop, the Supreme Court concluded that before the critical event under analysis (there, an ostensible consent to search; here, the frisk and subsequent search of the hip pocket) occurred, it had ripened into a *de facto* arrest. There, to be sure, the detainee was moved from the public concourse to a private office not far away. That physical movement did not occur in this case. Here, however, the length of the detention prior to the critical event was longer. In concluding that the police had exceeded the limited intrusion permitted by *Terry,* the *Florida v. Royer* Court observed, at 460 U.S. 499, 103 S.Ct. 1325:

> "Nor may the police seek to verify their suspicions by means that approach the conditions of arrest.... [R]easonable suspicion of crime is insufficient to justify custodial interrogation even though the interrogation is investigative."

The length of the detention here, 45 minutes to an hour, was excessive in scope. It is not the lapse of time, *per se,* that makes it so. If some legitimate purpose were being served by a necessary wait, our conclusion might be otherwise. Here, however, the police were no longer waiting for a radio check. The police had long since received answers to their initial inquiries. They were simply waiting for the detainees, resistance worn down, to change their stories and confess. That goal, certainly not ignoble, is nonetheless beyond the limited purpose of a *Terry* stop.

Highly persuasive is the Supreme Court's treatment of another excessively prolonged detention in *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). The detention found to be unconstitutional there had lasted 90 minutes. The police were at least waiting specifically for the opportunity to bring the detained suitcase into contact with a trained, drug-sniffing canine. Notwithstand-

ing a clear purpose to be served by the prolongation of the detention, a factor not here present, the Supreme Court found the duration of the detention to be unreasonable, saying, 462 U.S. at —, 103 S.Ct. at 2645, 77 L.Ed.2d at 122:

> "The length of the detention of respondent's luggage alone precludes the conclusion that the seizure was reasonable in the absence of probable cause. Although we have recognized the reasonableness of seizures longer than the momentary ones involved in *Terry, Adams,* [*v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)], and [*United States v.], Brignoni-Ponce* [422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975)], *see Michigan v. Summers,* [452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981)] *supra,* the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion."

Although refraining from establishing an outer time limit in absolute terms,[4] the Court did note:

> "Thus, although we decline to adopt any outside time limitation for a permissible *Terry* stop, we have never approved a seizure of the person for the prolonged 90-minute period involved here and cannot do so on the facts presented by this case."

*Id.*

## THE FRISK

■■■ Even if the stop had been legitimate, that would not imply the legitimacy of the frisk. As a distinct intrusion, the frisk requires its own independent justification. The particularized and individualized suspicion that the stoppee

---

4. As a guidepost, the Supreme Court did point out that the American Law Institute's Model Code of Pre-Arraignment Procedure, at § 110.-2(1) (1975) has recommended a maximum of 20 minutes for a Terry stop.

may be armed was discussed by *Sibron v. New York,* *supra,* at 392 U.S. 64, 88 S.Ct. 1903:

> "The police officer is not entitled to seize and search every person whom he sees on the street or of whom he makes inquiries. Before he places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so. In the case of the self-protective search for weapons, he must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous."

█ If in the present case the police had any reason to suspect that the appellant and Alexander were armed, they failed utterly to articulate those reasons. They provided no independent justification for the frisk at all. The frisk here, in terms of justification, is indistinguishable from that struck down in *Ybarra v. Illinois,* 444 U.S. 85, 93, 100 S.Ct. 338, 343, 62 L.Ed.2d 238, 246–247 (1979), which also failed for lack of any articulated justification:

> "Upon seeing Ybarra, they neither recognized him as a person with a criminal history nor had any particular reason to believe that he might be inclined to assault them. Moreover, as Police Agent Johnson later testified, Ybarra, whose hands were empty, gave no indication of possessing a weapon, made no gestures or other actions indicative of an intent to commit an assault, and acted generally in a manner that was not threatening.
>
> At the suppression hearing, the most Agent Johnson could point to was that Ybarra was wearing a ¾-length lumber jacket, clothing which the State admits could be expected on almost any tavern patron in Illinois in early March. In short, the State is unable to articulate any specific fact that would have justified a police officer at the scene in even suspecting that Ybarra was armed and dangerous."

In addition to the utter failure to provide anything by way of any articulated reasonable suspicion, the frisk in the present case suffers a further blot on its escutcheon of

plausibility. It did not precede the 45-minute-to-one-hour detention; it followed it. The very *raison d'être* for a frisk, as the frequent boon companion of the stop, is the protection of the life and limb of the stopping officer from the stoppee during the course of the stop.

A number of things about this frisk don't ring true. Essentially the same team of investigating officers did not bother to frisk either Hall or Jones when they were stopped near the abandoned Datsun minutes after the crime had occurred. Officer Abbamonte, moreover, was part of the police team participating in those earlier stops.

Officer Penney was alone when he first stopped the appellant and Alexander, yet felt no apparent need to frisk them. For most of the prolonged detention of the appellant and Alexander, as many as four or five policemen in at least four patrol cars were at the scene. The notion that the officers and the detainees were for some significant period of time merely "chatting," moreover, cuts against the grain of belief that those detainees were "armed and dangerous." [5]

Officer Abbamonte made one effort to explain the decision to execute a delayed frisk: "There were four officers there at that time; however, two were leaving, and it was going to be Officer Penney and myself. So for the safety of myself and Officer Penney, I felt it was the thing to do."

There was no explanation as to why it would not have been a wise precautionary measure, if justified, even while four officers were there for the better part of an hour. There was no explanation for why Officer Penney did not need such protection earlier, when he was absolutely alone with the two detainees. There was no explanation, moreover, of why a frisk would be necessary at all *if the stop were about to terminate.* That becomes the critical question.

---

**5.** The participle "chatting" does unmistakably connote some mutuality of pleasure from an easy and unthreatening conversational experience.

## THE FRISK AS AN INCIDENT OF A CONSENSUAL TRIP TO THE STATION HOUSE

At the end of 45 minutes to an hour, was the stop about to terminate? It appears it had unquestionably "run out of steam." To what next step did the encounter then progress? The answer is problematical.

Officer Abbamonte disclaimed any intention, prior to the frisk, of taking the two detainees, consensually or otherwise, down to the station house. He advised them of their *Miranda* rights, including a right to silence, a right to counsel, a right to have counsel present during the impending interrogation, and a right to stop the interrogation at any time. Such warnings connote custody. They communicate, moreover, to the recipients of those warnings that the recipients are not free to leave. The following occurred right after the administering of the *Miranda* warnings:

"Q: Then what were you going to do?

A: Almost immediately after that, I advised them to face Officer Penney, and I proceeded to pat them down. I explained to them at the time, that I was checking to make sure that they were not armed for our safety. That I was going to check them for weapons; and I proceeded to pat them down from the rear as they faced Officer Penney.

Q: *Were you planning to take them someplace at that time?*

A: *No,* it was just since Officer Penney—there were four officers there at the time; however, two were leaving, and it was going to be Officer Penney and myself. So for the safety of myself and Officer Penney, I felt it was the thing to do." (Emphasis supplied).

 Despite his disclaimer of "planning to take them someplace at that time," Officer Abbamonte's conduct implies an intention to place the detainees in actual custody and, presumably, to take them to the station house. Surely, for instance, the lawyer to be provided to the detainees,

upon their request, was not to be provided at the intersection of Georgia Avenue and Ralph Road.

The testimony of Officer Penney candidly acknowledges a formed intention of taking the two detainees to the station house, although Officer Penney claimed that the trip to the station house was to be consensual, not custodial:

"Q: Did you frisk—when did you first do that?

A: We explained to them—well, we didn't do that until we asked them to come down to the station with us because we wanted to talk to them more about what was going on.

Q: Did you place them under arrest at that time?

A: No, we did not.

Q: Why not?

A: Before we frisked them we did not place them under arrest. We asked them if they would come down to the station.

Q: Did you hear what Mr. Alfred said to that? Did he agree to do that?

A: Both of them agreed to do it."

Under either version, the stop phase was over and had become 1) a *de facto* arrest under Officer Abbamonte's version, or 2) a totally consensual situation under Officer Penney's version. Under neither version was the frisk an incident of a now-terminated stop; under neither version was the frisk constitutional.

▮▮▮ Even if we assume a *de facto* arrest in the absence of a formal arrest, the search of the appellant could not have been an incident to a lawful arrest, because there clearly was not probable cause to justify a warrantless arrest.

▮▮▮ Nor could the frisks be constitutionally justified under Officer Penney's version. If the detainees agreed voluntarily to come down to the station house, that would have to have been a truly voluntary and consensual act on their parts. They could not have been removed to the station house under the limited authority of a *Terry* stop.

If the police had no right, under color of their governmental authority, to insist that the two young men come to the station house, neither did the police have any right to subject them, under color of their governmental authority, to a frisk. The submission to the frisk, no less than the trip to the station house itself, should properly have been a fully consensual act. These detainees were not asked if they would voluntarily agree to a frisk. They were ordered to turn around and be frisked.

In the vast case law of the Fourth Amendment, we know of no such creature as a frisk incident to a consensual trip to the station house. We are certainly not about to create one.

## THE SCOPE OF THE FRISK

■ Even if they had not already stumbled on one or more occasions, one final hurdle still loomed before the investigating officers—the permitted scope of the limited intrusion known as "frisk." A frisk, permitted on a basis less substantial than probable cause, is not designed to assist the police in recovering evidence of crime. It is a limited measure designed exclusively to detect the presence of offensive weapons, exclusively to protect the life and limb of the stopping officer.

■ Under the ever-present minimization requirement of the Fourth Amendment, only a pat-down of the exterior of the clothing surface is permitted. The reason for this limitation is that a pat-down is enough to reveal the presence of large and palpable weapons, such as guns, knives, blackjacks, and brass knuckles.

In the present case, the appellant was described as wearing a pair of snuggly-fitting, body-clinging cutoff jeans. Even accepting the need for an actual pat-down rather than a visual scan, *vis-à-vis* the hip pocket in question, the pat-down clearly did not reveal a weapon. We have looked at, touched, and examined the small piece of jewelry now in issue. It measures several inches in diameter and is constructed of fragile, leaf-like silver. The sense of touch

would clearly have revealed that it was not a gun, a knife, a blackjack, brass knuckles, or any other conceivable weapon. The police, indeed, did not claim as much. They thought they detected a piece of jewelry and they knew that jewelry had been stolen in the course of the burglary then under investigation. Their position was admittedly difficult. Their instincts told them that they had the right men, as indeed they did. They were frustrated at not having obtained confessions of the burglary even after an hour. They now strongly sensed that they had touched, through a layer of cloth, an item stolen in the burglary.

If they thought, however, that their sense of touch had given them probable cause to believe that the stolen goods were in the appellant's pocket and that the appellant was, therefore, the burglar, they were required to arrest him. Since the frisk had not revealed the probable presence of a weapon, the item touched could not be removed for further examination under the authority of a frisk.

■ For all of these many reasons, the search of the appellant's hip pocket was unconstitutional and the evidence produced should properly have been suppressed.

JUDGMENT REVERSED; COSTS TO BE PAID BY MONTGOMERY COUNTY.