514 A.2d 35

**Parker FARROW**

v.

**STATE of Maryland.**

**No. 1380, Sept. Term, 1985.**

Court of Special Appeals of Maryland.

Sept. 5, 1986.

**520**

---

Julia Doyle Bernhardt, Asst. Public Defender (Alan H. Murrell, Public Defender, Baltimore, W. Gary Kohlman and Kohlman & Fitch on brief, Washington, D.C.), for appellant.

Ann E. Singleton, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen., Baltimore, Andrew L. Sonner, State's Atty. for Montgomery Co. and Thomas Tamm, Asst. State's Atty. for Montgomery Co. on brief, Rockville), for appellee.

Argued before WEANT, ALPERT, ROBERT M. BELL, JJ.

WEANT, Judge.

Parker Farrow, appellant, was convicted by a Montgomery County jury of robbery with a deadly weapon and of use of a handgun in the commission of a felony. On appeal, Farrow contends that the trial court erred in denying defense motions to suppress statements and tangible evidence. This is not precisely the case. Farrow's motions were heard and denied by a motions judge in a pre-trial suppression hearing; review of that ruling is properly before us under Md. Rule 4–252(g)(2), and we, like the motions judge, shall assume Farrow's standing to object to the search of the automobile and shall affirm the denial of his suppression motions.

## *Facts*

On 6 September 1984, Salter's Jewelry Store, located in Silver Spring, Maryland, was robbed at gunpoint by two black men in their twenties, between 5'5" and 6' tall. Taken in the robbery was, among other things, a distinctive gold-plated Indian Head penny ring.

Because police believed that Salter's, attended as it was by only the elderly Mrs. Salter, would be marked "easy pickings" for future robberies, a plain clothes surveillance unit was set up to watch the neighborhood on 19 September 1984, that unit observed two black males, Farrow and a companion, acting in a suspicious manner. They walked by Salter's, hesitated, and looked in; then one subject stood on a corner looking both ways while the other peered into the windows of Fredland Jewelers, located near Salter's. The two men then conversed and walked across the street to I and R Jewelers and look in its windows. After espying both directions and conversing, the men walked to a parking lot where they got into a car and drove away.

Officers following the car reported that the first three numbers of the rear license plate were covered with paper

and masking tape. Shortly after driving into Washington, D.C., the subjects stopped the car and removed the license plate covering. The officers did not detain the car at that time because they "did not have enough people to safely stop the vehicle."

The following day, officers once again set up surveillance at a point where they could observe both Salter's and Fredland Jewelers. The same car, with Farrow driving, approached the neighborhood. This time Farrow had a different companion. The subjects looked toward Fredland's as they drove past and then parked the car several blocks away. Farrow walked past Salter's and Fredland's and then returned to the auto and drove away. The car, with Farrow as driver, passed another jewelry store and slowed to allow the men to look in. They then parked and walked up and down in front of Chevy Chase Savings and Loan. When the men returned to their car, the officers, one aided by binoculars, saw a "bulge" underneath Farrow's shirt.

As the subjects' car headed back toward the District of Columbia, the officers decided that they had enough suspicion and sufficient forces (five officers) to stop the vehicle. Police cars surrounded the vehicle at an intersection; officers approached with drawn guns, opened the door, and pulled Farrow out. As soon as the door was open, officers saw a broken half of a pool cue with black tape on one end lying next to the driver's seat. In the meantime, officers placed Farrow face down on the pavement and handcuffed him. A search of the passenger compartment yielded a .32 caliber handgun. Farrow was placed under arrest.

While Farrow was being processed at the police station, officers noticed that he was wearing a gold ring which matched the description of the Indian Head ring stolen in the Salter robbery. Mrs. Salter identified the ring and Farrow was charged with having committed that robbery.

Farrow now complains that it was error to deny suppression of the gun (as well as certain statements and the ring

as "fruit") because (a) police were without the necessary suspicion to stop him, and (b) the means by which he was detained were unreasonable. We disagree.

### Investigative Detention and Protective Search

■ "The Fourth Amendment is not, of course, a guarantee against *all* searches and seizures, but only against *unreasonable* searches and seizures." *U.S. v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985) (emphasis in original). From the reasonableness clause of the fourth amendment has emerged a balancing principle: The scope of the fourth amendment intrusion must be proportional to the quantum of justification for that intrusion. Viewing the cases as on a continuum, when the intrusion is slight, the justification need not be great. *See, e.g., See v. City of Seattle,* 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967); *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) (administrative searches conducted on the basis of no particularized suspicion). Further along the continuum is the investigatory "stop" and protective "frisk" authorized by *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Under that ruling, a brief but forceful detention (the "stop") is allowed based on an articulable suspicion that criminality is afoot, and a limited search (the "frisk") is likewise permitted based on the same degree of suspicion that the subject is armed and presently dangerous. The continuum proceeds, of course, to a full blown custodial arrest based on probable cause. Thus recognizing that "[s]treet encounters between citizens and police officers are incredibly rich in diversity," *id.* at 13, 88 S.Ct. at 1875, the Court has provided officers with "an escalating set of flexible responses graduated in relation to the amount of information they possess." *Id.* at 10, 88 S.Ct. at 1874.

In our view the police had articulable suspicion justifying a *Terry* stop of Farrow. Farrow's behavior in walking past several jewelry stores many times was enough to arouse police suspicion that he and his respective companions were

"casing" the establishments for a robbery. Indeed, Officer McFadden, of *Terry v. Ohio* fame, acted on remarkably similar grounds. But officers here, unlike McFadden, were able to observe the suspicious behavior for a much longer period and on two different days. In addition, suspicions in the instant case were heightened by the suspects' masking of the license plate.

Likewise, it is clear that the police were justified in conducting the "frisk." They had observed a telltale bulge under Farrow's clothing that they feared might be a gun, *see, Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); the investigation which led the police to the car was of an armed robbery; and, when the officers opened the car door they observed half a pool cue lying on the seat, which club-like instrument the officers could have reasonably suspected, taking into consideration the totality of the circumstances, was more likely being carried as a weapon than as sports equipment. *See Terry*, 392 U.S. at 27, 88 S.Ct. at 1883 (in deciding whether he is in danger, officer is entitled to draw reasonable inferences from the facts in light of his experience). In *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), in fact, a protective search ("frisk") of the suspect's car was triggered by the officers' observation of a weapon in plain view within the suspect's vehicle.

### Stop or Arrest?

Appellant continues to argue that even if the stop was justified, the means used to detain Farrow were unreasonable, thereby converting the stop into an arrest which, in the absence of probable cause, was illegal.

While admitting the difficulty created by some of its cases in distinguishing an investigative stop from a *de facto* arrest, the Supreme Court has stated that "[m]uch as a 'bright line' rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern overrigid criteria," *Sharpe*, 105 S.Ct. at 1575, and that "[a] court making

this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second guessing." *Id.* at 1576. Ergo, in evaluating these confrontations, *"it is absolutely essential that courts reach determinations based not upon some abstract or illusory notion of what police-citizen encounters ought to be like in an ideal world but upon an objective evaluation of the realities of the encounter as it occurred." People v. Finlayson,* 76 A.D.2d 670, 431 N.Y.S.2d 839, 847–48 (1980) (emphasis in original), *cert. denied,* 450 U.S. 931, 101 S.Ct. 1391, 67 L.Ed.2d 364 (1981). As Judge Cardozo warned, "we are not to close our eyes as judges to what we must perceive as men." *People ex rel. Alpha Portland Cement Co. v. Knapp,* 230 N.Y. 48, 63, 129 N.E. 202, 208 (1920), *cert. denied,* 256 U.S. 702, 41 S.Ct. 624, 65 L.Ed. 1179 (1921).

When justified by the circumstances, courts have approved flexible police responses to the problem of a *Terry* stop. *See, e.g., U.S. v. Hensley,* 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985) (police approached suspect's car with drawn guns); *U.S. v. Taylor,* 716 F.2d 701 (9th Cir.1983) (that officers approached car with drawn guns, ordered uncooperative suspect to lie in a ditch, and handcuffed him did not transform the stop into an arrest); *Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981) (officers justified in forcibly detaining suspect in order to "exercise unquestioned command of the situation"); *People v. Chestnut,* 51 N.Y.2d 14, 431 N.Y.S.2d 485, 409 N.E.2d 958, *cert. denied,* 449 U.S. 1018, 101 S.Ct. 582, 66 L.Ed.2d 479 (1980) (although suspect ordered to lie on the ground, court refused to accept the proposition that the fourth amendment's protections turn on whether the detainee is positioned against a wall and frisked or is ordered to lie on the ground). In addition, although the Supreme Court, in approving a 20–minute *Terry* stop in *U.S. v. Sharpe,* focused on the *length* of the stop, the Court recited without comment the fact that police, in accomplishing the

stop, approached the auto with drawn guns and ordered one suspect "spread eagled" against the vehicle.

The Maryland Court of Appeals, when confronted with the contention that "the use of physical force to effectuate an investigatory stop is impermissible under the fourth amendment," stated:

> We believe this contention neither states the prevailing constitutional law nor recognizes the practical reality and requirements of this type of police investigation. To embrace a rule such as that advocated by the petitioner would unnecessarily undermine the vitality of police investigation in the field, recognized and approved as a necessary ingredient of police practice in *Terry*.

*Watkins v. State*, 288 Md. 597, 609, 420 A.2d 270, 276 (1980). The Court concluded that "when the Supreme Court used the term 'forcible stop' it meant what it said." *Id.* at 610, 420 A.2d at 277 (citations omitted).

The point is that a "stop" is, in fourth amendment terms, a seizure of the subject—a forceful detention in complete restraint of his freedom to walk away. *Terry*, 392 U.S. at 16, 88 S.Ct. at 1877. (Likewise, a "frisk" is a cognizable fourth amendment search.) The distinction between a *Terry* "stop" and an arrest, then, is not in the *method* of detention, but rather has to do with the length of the detention, the investigative activities during the detention, and whether the suspect is removed to a detention or interrogation area. *See Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). As a leading commentator has said,

> Without necessarily suggesting that an otherwise valid *Terry*-type stop should never be undone by an extraordinary show of force, . . . [t]o conclude that the officers' conduct must be viewed as an arrest from the outset because the defendant's restriction of liberty of movement was then complete and that no significant new restraint followed when the arrest was formally made, is to create a test which would cast doubt upon most stops.

The typical stopping for investigation cannot be viewed as anything but a complete restriction on liberty of movement for a time, and if investigation uncovers added facts bringing about an arrest, the early stages of the arrest will not involve any new restraint of significance.... A stopping for investigation is not a lesser intrusion, as compared to arrest, because the restriction on movement is incomplete, but rather because it is brief when compared with arrest, which (as emphasized in *Terry* [392 U.S. at 26, 88 S.Ct. at 1882]) "is inevitably accompanied by future interference with the individual's freedom of movement, whether or not trial or conviction ultimately follows."

W. R. LeFave, *Search and Seizure* § 9.2 at 29–30 (1978) (footnote omitted).

Returning to the case at bar, and mindful of the fact that because of the "inordinate risk confronting an officer as he approaches a person seated in an automobile," *Pennsylvania v. Mimms*, 434 U.S. at 110, 98 S.Ct. at 333, "roadside encounters between police and suspects are especially hazardous," *Michigan v. Long*, 463 U.S. at 1049, 103 S.Ct. at 3481, we hold that, in this situation, where police were facing men that were strongly suspected of being armed robbers, the officers were justified in taking complete control of the situation for that period of time necessary to accomplish the "frisk." The need for further investigation was pre-empted when an illegal handgun turned up within the lawful perimeters of the "frisk."

### *Search Incident to a Lawful Arrest*

■ In the alternative, we agree with the motions judge that, at the moment they caught sight of the half pool cue, police had probable cause to arrest Farrow under Md. Code Ann. art. 27, § 36, for carrying or wearing a concealed weapon on or about his person.

"[I]f a dangerous weapon is concealed in an automobile in such proximity to the owner as to make it available to him

for his immediate use it is concealed 'upon or about his person' in violation of [§ 36]." *Shipley v. State,* 243 Md. 262, 268, 220 A.2d 585, 588 (1966). In our opinion, the pool cue was so concealed.

The question remains, however, whether the cue can be considered a "dangerous weapon" within the meaning of § 36. This Court has stated:

> Whether an object that is not a weapon *per se* is used, carried or possessed as a weapon on a particular occasion depends upon the surrounding circumstances. If the object, although normally a tool, is closely akin to a weapon, as a knife or an axe, far less proof should be required to persuade one of its character as a weapon on a given occasion than if the object bears little or no resemblance to traditional weapons, as the fingernail file, pen, telephone cord, or piece of string....

*Dunn v. State,* 65 Md.App. 637, 642, 501 A.2d 881, 883–84 (1985).

In our view, half a pool cue, broken off and altered with black tape wrapped around one end, could more reasonably be viewed, under the circumstances, as a club with a handle than as a pool cue. We therefore hold, in the alternative, that the gun could be viewed as having been legally seized in a search incident to an arrest under art. 27, § 36. *See New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981); *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

JUDGMENTS AFFIRMED.

COSTS TO BE PAID BY APPELLANT.

ROBERT M. BELL, Judge, dissenting.

We learn today that when the police have reasonable articulable suspicion to effect a *Terry* [1] type stop and frisk,

---

**1.** *Terry v. Ohio,* 392 U.S. 1, 24, 88 S.Ct. 1868, 1881, 20 L.Ed.2d 889 (1968) (A protective search for weapons in the absence of probable

either an arrest is not an arrest or it is irrelevant whether there has been an arrest. By so holding the majority lays to rest the lamentation, heard more and more in recent years, that only lip service is paid to the "general rule that seizures of the person require probable cause to arrest." *Florida v. Royer*, 460 U.S. 491, 499, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983). Rather, the majority opinion makes patent that it is no longer necessary that even lip service be paid to this venerable concept. Although merely a small, lone voice crying out in the wilderness, I wish to make it clear beyond cavil that this lone voice, both loudly and vigorously, does protest its unjustified and untimely demise.

" ... [N]ot all seizures of the person must be justified by probable cause to arrest for a crime." *Florida v. Royer*, *supra* at 498, 103 S.Ct. at 1324 (1983). If there is an articulable suspicion, but not probable cause, that a person has committed, *United States v. Hensley*, 469 U.S. 221, 105 S.Ct. 675, 680–81, 83 L.Ed.2d 604 (1985), *but see Anderson v. State*, 282 Md. 701, 387 A.2d 281 (1978), is committing, or is about to commit a crime, and is dangerous and armed, a stop and frisk for weapons, is justified. *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968). *See Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972); *Alfred v. State*, 61 Md.App. 647, 655, 487 A.2d 1228 (1985); *Gibbs v. State*, 18 Md.App. 230, 237–38, 306 A.2d 587 (1973). This applies to a stop and detention of a moving automobile when the occupants are reasonably suspected of being involved in criminal activity. *United States v. Brignoni-Ponce*, 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975). The police may, in appropriate circumstances, *i.e.* when the occupants are reasonably believed to be dangerous, conduct a protective search of the person of the occupants and of the passenger compartment of the car. *Michigan v. Long*, 463 U.S. 1032, 1049–50, 103 S.Ct. 3469, 3480–81, 77 L.Ed.2d 1201 (1983).

---

cause to arrest may be conducted when an officer possesses an articulable suspicion that an individual is armed and dangerous.)

The stop, as well as the "frisk", must, of course, be based on specific and articulable facts which justify the actions. *Id.; United States v. Brignoni-Ponce, supra.* The detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer, supra,* 460 U.S. at 500, 103 S.Ct. at 1325.

On the other hand, *"Terry* and its progeny . . . created only limited exceptions to the general rule that seizures of the person require probable cause to arrest." *Id.,* 460 U.S. at 499, 103 S.Ct. at 1325. Thus, when the police arrest a person, *i.e.,* take him or her into custody for purposes of charging him or her with a crime, or effect a seizure of the person similar to arrest, regardless of how the seizure is characterized, probable cause must exist in order for the seizure to be valid. *See Dunaway v. New York,* 442 U.S. 200, 212, 99 S.Ct. 2248, 2256, 60 L.Ed.2d 824 (1979); *Florida v. Royer, supra,* 460 U.S. at 499, 103 S.Ct. at 1324; *Trusty v. State,* 67 Md.App. 620, 623, 508 A.2d 1018 (1986).

Despite these principles, which it acknowledges, the majority concludes that the police action in the case *sub judice* did not vitiate an otherwise valid stop and frisk. In effect, the majority says that no arrest was effected and that the seizure made was reasonable under the circumstances. The majority relies upon *United States v. Hensley,* 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985); *Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981); *United States v. Taylor,* 716 F.2d 701 (9th Cir.1983); *People v. Finlayson,* 76 A.D.2d 670, 431 N.Y.S.2d 839 (1980), *cert. denied,* 450 U.S. 931, 101 S.Ct. 1391, 67 L.Ed.2d 364 (1981); *People v. Chestnut,* 51 N.Y.2d 14, 431 N.Y.S.2d 485, 409 N.E.2d 958 *cert. denied,* 449 U.S. 1018, 101 S.Ct. 582, 66 L.Ed.2d 479 (1980); 3 W. LA FAVE, *SEARCH AND SEIZURE,* § 9.2(d) (1978 & Supp.1986) and cases therein cited.

My disagreement with the majority could not be more basic. The seizure in this case was unquestionably an arrest, *see Morton v. State,* 284 Md. 526, 397 A.2d 1385 (1979); *Bouldin v. State,* 276 Md. 511, 350 A.2d 130 (1976), or a seizure of the person similar to arrest. *Dunaway v. New York, supra.* The surrounding circumstances and the police action itself provide the proof. Not only was appellant's car surrounded so as to prevent its movement, but the police approached the car with drawn revolvers, pulled appellant from the car, and placed him face down on the ground. Furthermore, he was guarded by one officer while another searched the passenger compartment of the car. This seizure was not a limited one undertaken for the limited purpose of investigating police suspicion; rather, it was a complete seizure.

In *Morton v. State, supra,* the Court of Appeals held that the defendant was arrested when the defendant was confronted by an officer in a recreational center, was told "to accompany him and to bring his possessions ...", and was placed in a patrol car with another officer while the first officer searched for the defendant's "possessions". The Court said:

> an arrest is the taking, seizing or detaining of the person of another, *inter alia,* by any act that indicates an intention to take him into custody and that subjects him to the actual control and will of the person making the arrest. On the record before us, Rice's manual seizure of the appellant and the subsequent restraint of his liberty plainly constituted an arrest .... .

284 Md. at 530, 397 A.2d 1385. *See also Royer, supra.* The facts here are considerably more compelling. *But see Watkins v. State,* 288 Md. 597, 420 A.2d 270 (1980).

The State argues that the police had an articulable suspicion that justified them stopping appellant. It then argues that they also had a reasonable suspicion that appellant was armed and dangerous, a bulge having previously been seen in his shirt; therefore, they continue, the method used to effect the arrest was reasonable under the circumstances.

While I may agree that there was an articulable suspicion that appellant was armed, which justified a frisk, I cannot agree that the police action under the circumstances was reasonable. Adopting the State's argument is to allow the exception " ...to swallow the general rule that Fourth Amendment seizures are 'reasonable' only if based on probable cause". *Dunaway v. New York, supra,* 442 U.S. at 213, 99 S.Ct. at 2257. Neither the Supreme Court nor our Court of Appeals has gone so far. In *United States v. Hensley, supra,* for example, the police officers approached the car, in which an occupant for whom a "wanted flyer" issued by another police department had been issued, with guns drawn and ordered that individual and another man out of the car; neither was *physically* removed from, or *physically* restrained, prior to the search. The "wanted flyer" advised that Hensley was to be considered armed and dangerous. Although the Court found the police actions in approaching the car were reasonable under the circumstances, it noted the briefness of the stop and the reasonableness of the reliance on the flyer as factors. In contrast, the seizure here was considerably more intrusive and the reliance on the observation of the bulge more tenuous. The Court of Appeals in *Watkins,* has found justification for the use of force in effecting a *Terry* stop. It did so, however, in a context where the stopping officer had "specific knowledge" that

a fellow police officer was pursuing two suspects reported to be armed; the suspects had eluded the foot patrolman just a few moments before Officer McEntee entered the city block in which they had last been seen; upon entering the block the officer heard the petitioner's companion yell "run, police," and observed Watkins run into an alley; and that in response to several calls to halt, the petitioner continued to attempt to evade the officer.

288 Md. at 604, 420 A.2d 270. *But see* Cole, J., dissenting at 610, 420 A.2d 270. Significantly, the Court recognized the quality and nature of the knowledge possessed by the

officer may be significant in assessing the officer's response:

'There is a difference of significant degree between a report only that a person has a gun in his possession and another report that a person not only has a gun but that he has just used it for the commission of a crime.' Of course, where the report indicates that the person has used the weapon to menace or threaten or will use the weapon if stopped for questioning ... then the personal and public safety may well mandate a more intensive police intrusion.

*Id.*, at 608, 420 A.2d 270, quoting *People v. De Bour,* 40 N.Y.2d 210, 386 N.Y.S.2d 375, 352 N.E.2d 562, 573 (1976).

The cases cited in La Fave, and relied upon by the majority, have not gone so far either. In none of them did the police action rise to the level reached in the instant case. Recognizing the general rule that probable cause is necessary to effect an arrest, the cases stand for the proposition that the display of weapons and other police actions do not necessarily transform a legitimate *Terry* stop into an arrest, that determination being dependent upon the particular facts there existing, *see United States v. Jones,* 759 F.2d 633 (8th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 113, 88 L.Ed.2d 92 (1985); *United States v. Manbeck,* 744 F.2d 360 (4th Cir.1984), *cert. denied,* 469 U.S. 1217, 105 S.Ct. 1197, 84 L.Ed.2d 342 (1985); *United States v. Nargi,* 732 F.2d 1102 (2d Cir.1984); *United States v. Danielson,* 728 F.2d 1143 (8th Cir.), *cert. denied,* 469 U.S. 919, 105 S.Ct. 300, 83 L.Ed.2d 235 (1984); *United States v. Aldridge,* 719 F.2d 368 (11th Cir.1983); *United States v. Taylor,* 716 F.2d 701 (9th Cir.1983); *United States v. Jacobs,* 715 F.2d 1343 (9th Cir.1983); *United States v. Roper,* 702 F.2d 984 (11th Cir.1983); *United States v. Merritt,* 695 F.2d 1263 (10th Cir.), *cert. denied,* 461 U.S. 916, 103 S.Ct. 1898, 77 L.Ed.2d 286 (1982); *United States v. Harley,* 682 F.2d 398 (2d Cir.1982), and the application of certain relevant factors, such as:

the number of officers and police cars involved, the nature of the crime and whether there is reason to believe the suspect might be armed, the strength of the officers' articulable, objective suspicions, the erratic behavior of or suspicious movements by the persons under observation, and the need for immediate action by the officers and lack of opportunity for them to have made the stop in less threatening circumstances.

*Jones, supra,* 759 F.2d at 639–40. *See also Harley, supra,* 682 F.2d at 402. ("The nature of the crime under investigation, the degree of suspicion, the location of the stop, the time of day, the reaction of the suspect to the approach of police are all facts which bear on the issue of reasonableness" of the police conduct.).

A few representative cases are illustrative. The Court in *Jones, supra,* found that the blocking of the accused's car and the display of weapons during the course of the stop did not transform the stop into an arrest where the encounter involved only one police car and two officers, the accused had run from the front of an apartment building upon seeing the police officers with a suspected burglar, the accused was in his car with the motor running and the accused went for a gun during the course of the encounter.[2] *Id.,* 759 F.2d at 635, 640. Similarly, no arrest was found when weapons were displayed in the stop of an individual suspected of selling drugs, where the accused reached in the back seat of the car as the agents approached the car. *Harley, supra,* 682 F.2d at 400. Although the question was close, an accused, suspected of being wanted for murder and reported to be heavily armed, was not found to have been arrested even though the police drew and pointed shotguns at him. *Merritt, supra,* 695 F.2d at 1273.

---

**2.** While in *Jones,* the accused was eventually shot by the police, that conduct occurred after the initial stop had been ongoing for some time. The entire encounter lasted between three to six minutes and it was towards the end of the three to six minute period that the accused was shot.

The cases relied upon by the majority are susceptible to the same analysis.[2a] For example, in *Taylor*, the Court found the handcuffing and frisking of the defendant for weapons were justified because the police "had strong evidence of drug activity and valid reasons to fear for their safety [they had been informed that prior experience showed the defendant's codefendant and anyone associated with him, to be dangerous]", *id.*, 716 F.2d at 709, and because

> Twice Pressler had disobeyed an order to raise his hands, and he made furtive movements inside the truck where his hands could not be seen. At this point Agent Dick found it wise to frisk Pressler for weapons. Because there were two suspects and only two or three officers on the scene, Agent Dick deemed it prudent to have Pressler lie down and be handcuffed during the frisk.

*Id.* In *Finlayson*, the lone officer's conduct in detaining the two defendants at gunpoint until he received additional information was justified where the stop occurred at night, in a deserted industrial area shortly after a holdup at a gas station had been reported. *Id.* 431 N.Y.S.2d at 848. To like effect, *see Chestnut, supra*, in which the action of a lone officer, responding immediately to a report of an armed robbery in the vicinity, in stopping a man, who matched the description of the robber, and his two companions, with gun drawn, was found justified.

Other cases have reached a contrary result. In *United States v. Ceballos*, 654 F.2d 177 (2d Cir.1981), for example, the Court concluded that the blocking of a defendant's car and the approach by officers with guns drawn constituted

---

**2a.** *Michigan v. Summers, supra,* is inapposite. There, the Court held that "for Fourth Amendment purposes, . . . a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of premises while a proper search is conducted." *Id.,* 452 U.S. at 705, 101 S.Ct. at 2595. No such situation existed here; nor does the State argue that it does. *See Taylor,* 716 F.2d at 707.

an arrest which in the absence of probable cause, was unlawful. A similar result was reached in *United States v. Strickler*, 490 F.2d 378 (9th Cir.1974). There, police cars surrounded the accused's automobile and the officers, with guns drawn, ordered the occupants to raise their hands. That conduct was determined to constitute an arrest, not merely an investigatory detention. Because there was no probable cause for the arrest, the accused's conviction was reversed. *See also State v. Williams*, 102 Wash.2d 733, 689 P.2d 1065 (1984); *State v. Raheem*, 464 So.2d 293 (La. 1985).

Turning to the case *sub judice*, an application of the factors identified in *Jones* produces a clear result. A number of police officers and cars were utilized to effect the stop; the reason for believing appellant to be armed was somewhat tenuous; and there was no evidence that appellant made any suspicious movements prior to being stopped or removed from the car. Moreover, the timing and the place of the stop and the intensity of the police response militate against a finding that the actions of the police were reasonable. In my view, appellant was arrested and not simply detained for an investigative stop.

There was no probable cause to justify the arrest. The trial judge did not find probable cause. The most damaging observation made by the police was that the license tag on the vehicle was covered on the day before the stop. Appellant was not identified as the person who had been driving the car at that time and on the day of the stop, the license tag was not covered.

In the absence of the covered license tag, the police observations are not remarkable and, even considering it, insufficient to rise to the level of probable cause to believe that a conspiracy to rob was in progress. If these observations could be found to be sufficient to constitute probable cause, then the existence of the concept is, at best, illusory.

The trial judge justified the arrest on the basis that probable cause existed to arrest appellant for carrying a

concealed dangerous and deadly weapon. The "weapon" was a half of a pool cue observed in the front seat of the car.

Art. 27, Sec. 36 (a), provides:

Every person who shall wear or carry any dirk knife, bowie knife, switchblade knife, sandclub, metal knuckles, razor, nunchaku, or any other dangerous or deadly weapon of any kind, whatsoever (penknives without switchblade and handguns excepted) concealed upon or about his person, and every person who shall wear or carry any such weapon, chemical mace or tear gas device openly with the intent or purpose of injuring any person in any unlawful manner, shall be guilty of a misdemeanor....

In order for the police to have had probable cause to arrest appellant for violating Art. 27, Sec. 36(a), the arresting officer would have had to have reason to believe: (1) that the pool cue was a dangerous or deadly weapon, and (2) that appellant was carrying or wearing it "concealed" or (3) that appellant was carrying it "openly with intent or purpose of injuring any person in any unlawful manner."

The trial judge's ruling is flawed in two respects. First, assuming for the sake of argument, that it is a dangerous weapon, the pool cue was lying in open view on the front seat; thus, it was not concealed.[3] Second, and just as important, neither the evidence nor circumstances support the conclusion that the pool cue was a weapon and, if a weapon, that it was being carried "with the intent or purpose of injuring any person".

In *Dunn v. State,* 65 Md.App. 637, 642, 501 A.2d 881 (1985), we explained the meaning of the term "dangerous weapon" as used in § 36(a):

---

**3.** The trial judge's and the majority's rationale for determining it to be concealed is not persuasive. Under their rationale, if one who has an object in his right hand is approached from the left side, from which the object cannot be seen, and if the object be determined to be a deadly weapon, that person has worn or carried a concealed deadly weapon.

[w]hether an object that is not a weapon *per se* is used, carried or possessed as a weapon on a particular occasion depends upon the surrounding circumstances. If the object, although normally a tool, is closely akin to a weapon, as a knife or an axe, far less proof should be required to persuade one of its character as a weapon on a given occasion than if the object bears little or no resemblance to traditional weapons, as the fingernail file, pen, telephone cord, or piece of string mentioned in the colloquy between Judge Melbourne and defense counsel.

The half pool cue bears little resemblance to a traditional weapon and there was no evidence that appellant intended to use it as a weapon. Moreover, the circumstances did not give rise to any inference that it was intended to be used to injure anyone. In short, there was simply no evidence upon which the court could find probable cause based on appellant's possession of the pool cue.

Since I conclude that there was, at the moment of arrest, no probable cause for appellant's arrest, the handgun seized in the search was tainted and, thus, was inadmissible against him. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Trusty v. State, supra*, 67 Md.App. at 623, 508 A.2d 1018; *DiPasquale v. State*, 43 Md.App. 574, 576, 406 A.2d 665 (1979). Similarly, and for the same reasons, the ring, although seized later, was inadmissible. Accordingly, the trial judge erred in admitting this evidence; therefore, the judgment should be reversed.