## JAMES WILLIE CLEVELAND *v.* STATE OF MARYLAND

[No. 578, September Term, 1970.]

*Decided August 12, 1971.*

The cause was argued before THOMPSON, CARTER and GILBERT, JJ.

*James F. Garrity* for appellant.

*James F. Truitt, Jr., Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *William Parsons Fennell, State's Attorney for Kent County,* on the brief, for appellee.

GILBERT, J., delivered the opinion of the Court.

This is the second appeal to this court by James Willie Cleveland. We reversed and remanded for a new trial the first conviction of the Appellant in *Cleveland v. State,* 8 Md. App. 204 (1969). Upon retrial Cleveland was again convicted of armed robbery and assault and battery and received sentences of 20 years and 5 years, respectively,

714

with the latter sentence to be served concurrently with the former.

The present record reveals that on the evening of November 9, 1968, at approximately 8:00 p.m., Sheriff Bartus O. Vickers received a telephone call from Leroy R. Crosby, an employee of the Rock Hall Liquor Store in Kent County, Maryland, that both he and the store had been robbed at gun point by a masked black male. Crosby had been relieved of his wallet and a sum of cash belonging to his employer, to which had been attached a paper writing in Crosby's own handwriting. Crosby, who was 78 years old at that time, was struck by the bandit in the stomach and knocked to his knees as the gunman left the store. Crosby described the person who robbed and assaulted him as a black male, six feet tall, weighing 180 to 190 pounds. He was unsure as to whether or not he described to the Sheriff the clothing the gunman was wearing, although the Sheriff stated the description he received from Crosby was that of a black man six feet tall, 175 to 180 pounds, dressed in a dark jacket with a lighter color pair of pants and wearing a cap. He even received from Mr. Crosby information as to the path the robber took upon leaving the scene of the crime. At the trial Crosby identified the paper writing, attached to the recovered money, as being in his handwriting.

Sergeant Boulter of the Maryland State Police, testified that at approximately 8:00 p.m. on November 9, 1968, he received a telephone call from Sheriff Vickers and was informed of the robbery. Boulter stated the Sheriff told him the robber was a "colored male, approximately 5 feet 11 to 6 feet tall, 175 to 80 pounds. He was dressed in a dark jacket, dark pants and a cap, a light tan colored cap." The Sergeant "hurriedly" put on his uniform and proceeded to the scene of the holdup which was only 8/10 of a mile from his home. Enroute he passed a laundromat located only 3/10 of a mile from his residence. Sergeant Boulter said that immediately in front of the laundromat he observed the Appellant dressed in a dark jacket, dark pants, wearing a light tan cap and walking

briskly along the laundromat parking lot. In Boulter's opinion Appellant "was walking rather rapidly, in a furtive manner." He apprehended the Appellant and in the course of the search of the Appellant's person found "a number of rolls of coins" and "pulled out rolls of money, that is paper money." The Sergeant further testified that he saw Appellant knock the cap from his [Appellant's] own head, as well as a stocking mask. The mask was retrieved behind the police car door from which the Appellant alighted as he was taken into the State police office. Appellant, at the time of his apprehension, was carrying a "six pack" of beer.

Robert W. Joiner, the chief of police of Rock Hall, testified that he found a pocketbook belonging to Crosby "where this man [Appellant] was in my car. And there was a deep ditch there, and that is where this pocketbook was found." He first saw the Appellant about 1/10 of a mile from the liquor store where the holdup occurred, coming from a tavern, with the six cans of beer. He had Appellant get into his car, radioed a Mr. Simms, and asked Simms to contact the Sheriff. He said he thought he "had the man that robbed the liquor store." Previously he had received information relative to the robbery. Appellant got out of the car and started toward the laundromat. Sergeant Boulter by that time had arrived at the laundromat area and made the arrest. A paper bag was used by the gunman to carry the paper currency, as well as the coins. A paper bag was recovered from the Appellant.

Appellant, in his testimony, said that he had gone into Coleman's Bar where he bought the beer and a man whom he identified as "Baltimore" gave him the paper bag. He found it to contain money which he put in his coat pocket. He denied all knowledge of the robbery. He stated he was in the liquor store an hour or so before the robbery where he bought "straight whiskey." He had at the time of the trial never seen or heard from "Baltimore" since the night of November 9, 1968.

Prior to the actual trial, the Appellant's attorney filed

a "Motion to Suppress Evidence" and a "Suggestion for Removal." Both motions were denied. The Suggestion for Removal was augmented by three copies of the Kent County News. The first copy was dated November 12, 1968 and said on page 1: "Rock Hall, Liquor Store Robbed at Gun-Point, Bandit-Suspect Captured By Police." The second newspaper was dated November 13, 1968 and contained an article on the front page entitled: "Man Held For Armed Robbery as Week-Long Crime Wave Hits." The third and last paper was dated December 3, 1969. Printed on the front page was "Rock Hall Liquor, Armed Robber Conviction Upset By Appellate Court," the latter article having direct reference to *Cleveland v. State, supra,* and quoting in part Judge Orth's opinion delivered for this court.

The Motion to Suppress and the Suggestion of Removal were both heard in May of 1970.

On appeal to this court the Appellant raises three arguments:

1. The trial court abused its discretion in not removing the case.

2. The arresting officer did not have probable cause to arrest the Appellant and the articles taken from him incident to the arrest should not have been received in evidence.

3. The lower court committed reversible error in allowing the State to impeach the Appellant by introducing a prior conviction.

## I

The Appellant's first contention is that the court should have granted his suggestion for removal inasmuch as he could not have a fair and impartial trial in Kent County because of the matters that appeared in the Kent County News, as above quoted. This case was tried for the second time on August 28, 1970, almost nine months after the last article appeared in the newspaper. In *McLaughlin v. State,* 3 Md. App. 515 (1968), Judge Anderson, speaking for this court said:

"The question of whether a non-capital criminal case should be removed to another jurisdiction is one which rests within the trial court's discretion. Maryland Constitution, Article IV, § 8; Maryland Rules 542 (1) and 738 (b). However, the trial court's decision is reviewable on appeal for a determination of whether there has been an abuse of discretion. *Seidman v. State*, 230 Md. 305, 187 A. 2d 109 (1962); *Benton v. State*, 1 Md. 647, 652, 232 A. 2d 541 (1967).

The question before the court is whether the trial court abused its discretion in refusing the requested removal. The cases in this state hold that newspaper disclosures standing alone do not support a defendant's suggestion that such disclosures deny him a fair trial. *Gray v. State*, 224 Md. 308, 316, 167 A. 2d 865 (1961) and cases cited."

We conclude from the record before us that there was no abuse of discretion by the trial court. The questions by the trial court and by Appellant's counsel on *voir dire* adequately covered the subjects of freedom from prejudice and adverse newspaper publicity.

## II

Appellant contends that the arresting officer did not have probable cause to arrest the Appellant and the articles seized from him were incident to an unlawful arrest so as to exclude their receipt into evidence.

The general rule is that a police officer may arrest, without a warrant, if he has probable cause to believe a felony has been committed and that the person arrested has committed it. *Robinson v. State*, 4 Md. App. 515, 522 (1968), *Simms v. State*, 4 Md. App. 160, 167 (1968), *Boone v. State*, 2 Md. App. 479, 481 (1967), *Cleveland v. State*, page 218, *supra*.

We said of "probable cause" in *Cleveland*:

"The rule of probable cause is a non-technical conception of a reasonable ground for belief of guilt, requiring less evidence for such belief than would justify conviction, but more evidence than that which would arouse a mere suspicion. *Terrell v. State,* 3 Md. App. 340. Only the probability, and not *prima facie* showing, of criminal activity is the standard for probable cause. *Beck v. Ohio,* 379 U. S. 89, 96."

Appellant relies heavily on the opinion of this court in his first appearance here. *Cleveland v. State, supra.* We said then:

"The evidence showed that the arresting officer had probable cause to believe that a felony had been committed. *The question is whether the evidence before the trial court was sufficient to show that the arresting officer had probable cause to believe that the appellant committed the felony.* This question must be considered in the light of what facts and circumstances, as shown by the evidence, were, at the time of the arrest, within the knowledge of the arresting officer, or of which he had reasonably trustworthy information. Information received by Boulter from the Sheriff would be reasonably trustworthy but *other than that there had been a robbery the evidence did not disclose with any specificity what that information was.* In fact it did not disclose what description of the robber the victim gave the Sheriff other than he was 'a negro male approximately six feet—.' The arresting officer testified that his attention was attracted to the appellant because he fit the description given by the Sheriff and he described the man he saw as appearing to be 'five feet eleven' and having on 'a dark jacket, dark pants.' But this conclusion by the officer that the appellant fit the description given by the Sheriff

serves no basis for a determination that a reasonably cautious person would be warranted in a belief that the appellant fit the description. We cannot speculate that the officer received a description that the robber was 'colored' was five feet eleven inches in height and was wearing a dark jacket and dark pants, even if such description could be deemed to show a probability that the man observed was the robber in the circumstances." (Emphasis supplied).

We pointed out that there was no showing of the description received by the Sheriff, nor the description given by the Sheriff to Sgt. Boulter. At the retrial Mr. Crosby testified that he had called the Sheriff and told him that he had been held up. The Sheriff inquired about the size of the man and Crosby informed the Sheriff that the gunman was about six feet tall and weighed approximately 180 to 190 pounds and "I told him he was a colored man." He stated that he did not know if he described to the Sheriff the clothing the gunman was wearing. He said, "I don't believe so, though possibly. I was a little excited at the time. I don't think that I said he had anything over his head at that time. If he asked me, I answered him, but I don't remember telling or I don't remember of the information coming voluntarily." Sheriff Vickers, however, testified that when he received the phone call from Mr. Crosby at about 8:00 p.m., "I asked him how tall he was or to give me a description. He said that 'the man was about six feet tall,' he thought about 175 to 80 pounds. I asked him how he was dressed. He said 'he was dressed in a dark jacket with a lighter pair of pants on but which were still dark.' He also stated he had a cap on and that he had left by way of the back door." The Sheriff related that he then called Sgt. Boulter by telephone and gave him the description of the man described by Mr. Crosby. Vickers stated that he called Boulter within two to five minutes after receiving Crosby's complaint. Sergeant Boulter, after testifying as to his expertise as an officer

of the Maryland State Police, the proximity of his home to the laundromat and to the Rock Hall Liquor Store, stated that he was at home on the evening of November 9 when he received a phone call from Sheriff Vickers. Concerning the telephone conversation, he said:

> "He [Vickers] called me and told me and he gave me the description of the holdup man. He said was a colored male, approximately six feet, weighed 175 to 180 pounds, was dressed in a dark jacket, dark pants, and wore a cap. Light tan colored cap * *. *. At that time he was giving me the description over the telephone, I was jotting down the description on a pad I had nearby the phone."

He had been in civilian clothes and changed into his uniform and started for the liquor store. He stopped at a stop-sign located near the laundromat and started to make a turn when, "I observed a colored male dressed in a dark jacket, dark pants, with a tan cap on, walking briskly across the laundromat parking lot. His gait was faster than the average gait of the average person. He was walking in a furtive manner, that is to say, he was looking back over his shoulder in my direction. I instantly recognized this as being the man that fit the description given to me by the Sheriff just minutes before as having held up the Rock Hall Liquor Store." He stated that approximately five or six minutes elapsed between the time he received the phone call from the Sheriff and the time he observed the Appellant on the parking lot.

The question then presented to this court is, has the State supplied the ingredients missing from the first Cleveland case as to probable cause? We think it has. Mr. Crosby testified as to giving a partial description of the gunman and says that he "possibly" supplied the other details if asked by the Sheriff. The Sheriff, without qualification, stated that he received a description from Crosby in response to his questions to Crosby and

that he related the same to Sgt. Boulter. Boulter then received the description and even wrote it down as he was receiving it. Within a few minutes thereafter he saw the Appellant, who fit the description received, and he made the arrest.

We hold the test of probable cause has been met. Sergeant Boulter, at the time of the arrest of the Appellant, at a site within one-half mile of the holdup and within moments of its occurrence, was relying on trustworthy information from the Sheriff that a felony had been committed. His observation of the Appellant's height, weight, "rapid gait and furtive manner" and wearing apparel, which matched that contained in the description of the robber, gave rise to reasonable grounds, beyond mere suspicion, for belief that the Appellant was the person who committed the robbery. The probability of criminal activity was shown.

### III

The Appellant lastly argues that the lower court committed reversible error in allowing the State to impeach the Appellant by interrogating him on his previous criminal convictions without first establishing that he was represented by counsel, or that he waived the same, and in disregarding the Appellant's testimony that although he was represented by counsel the case was on appeal.

On cross-examination of the Appellant in this case the State's Attorney posed a question to Appellant as to whether or not Appellant had ever been convicted of a crime. An immediate interjection was made by Appellant's attorney. A hearing was held out of the presence of the jury.

Appellant then testified that he was represented by counsel in the 1950 case. He was convicted of first degree murder, for which he was sentenced to death by electrocution; then he was retried, apparently as the result of a reversal, and again convicted of first degree murder and sentenced to life imprisonment. He was pa-

roled in the summer of 1968, although he was not certain what date.

In 1949 Appellant received a six month sentence for assault with a knife. He was not, at that time, according to his testimony, represented by an attorney. When the jury was recalled, Appellant was only asked about the 1950 crime. The testimony was properly admitted. See *Johnson v. State,* 9 Md. App. 166 (1970).

During the jury's absence the Appellant had testified in response to his counsel's questions that his 1950 conviction was pending before the Supreme Court of the United States "for the October term." Section 10 of Article 35 of the Annotated Code of Maryland provides in part:

> "* * *. No conviction may be used for any purpose under this section when the conviction is being appealed or the time for noting an appeal has not expired."

Hence, Appellant argues that the evidence of the prior conviction should have been excluded. No copies of briefs or documents of any type were introduced by the Appellant to support his bare allegation that an appeal was pending. The effect apparently sought by Appellant's oral assertion of a pending appeal was to shift to the State the burden of proving that an appeal was *not* pending. We do not so interpret § 10, *supra.* We hold that this section does no more than prohibit the use of prior convictions where it is evident that an appeal is pending or that the time for taking an appeal has not expired. The trial judge was not required to believe Appellant's naked declaration of an aged pending appeal. It is incumbent upon the Appellant to affirmatively demonstrate by clear and convincing evidence the applicability of the prohibition. Of course, such a showing must be made out of the presence of the jury.

*Judgments affirmed.*