525 A.2d 653

**Mitchell Mickey MOORE**

v.

**STATE of Maryland.**

No. 886, Sept. Term, 1986.

Court of Special Appeals of Maryland.

May 13, 1987.

Certiorari Denied Sept. 9, 1987.

318

Isaac S. Kershner, Assigned Public Defender (Alan H. Murrell, Public Defender, on the brief), Baltimore, for appellant.

Richard B. Rosenblatt, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen., Baltimore, Andrew L. Sonner, State's Atty., for Montgomery County and Robert Dean, Asst. State's Atty., for Montgomery County, on the brief, Rockville, for appellee.

Argued before WEANT, ROSALYN B. BELL and ROBERT M. BELL, JJ.

ROSALYN B. BELL, Judge.

Mitchell Mickey Moore was convicted by a jury in the Circuit Court for Montgomery County of attempted murder in the second degree, first degree rape, robbery with a deadly weapon, and statutory housebreaking. Moore was sentenced to 30 years incarceration without parole for at-

tempted murder, and consecutive sentences of life and 30 years imprisonment for the remaining convictions. Moore presents two questions for our resolution:

"1. Did the court err in denying Appellant's motion to suppress extrajudicial identifications and evidence obtained in violation of the Fourth Amendment?

"2. Did the court abuse its discretion in the denial of Appellant's request, based on a discovery violation, to exclude fingerprint evidence?"

Briefly, a 23-year-old woman was violently attacked in her Silver Spring apartment in the early afternoon of September 28, 1984, when a man pushed his way into her home after showing her two photographs from his wallet and inquiring into the whereabouts of the photographs' subjects. The victim subsequently identified Moore as her attacker and the photographs seized from his wallet as those shown by her attacker. More details will be supplied as necessary to explain the issues presented.

## I. PROBABLE CAUSE

The events surrounding appellant's arrest in the crime *sub judice* began on October 15, 1984 at approximately 12:15 p.m. in the District of Columbia. Metropolitan police officers Craig Munro and James Bovino were in their marked police wagon near the intersection of Cathedral Avenue and Bellevue Terrace in the northwest quadrant of the city. While Bovino was issuing a traffic citation, Munro heard a police radio dispatch about a woman screaming for help in the 4400 block of Edmunds Street. When Bovino returned to the wagon, Munro advised him of the broadcast and they proceeded to discuss the location of Edmunds Street. Both officers then observed appellant walking on the opposite side of the street. Appellant approached the officers and requested directions to 22nd and Q Streets. Munro exited the vehicle to give appellant directions. While they were conversing, a description of the Edmunds Street offender was broadcast in response to Bovino's request. The dispatch, reported at 12:21 p.m., disclosed a robbery

committed between 11:30 a.m. and 12:00 noon in which the complainant was beaten and knocked unconscious, and money and jewelry were stolen.[1] The suspect, as described by the complainant, was:

"[A] black male. In his 20's. Five-foot eight. One hundred and eighty pounds. Wearing a dark leather jacket. The complainant believes it might have been black. She states he also wore she believes blue jeans."[2]

Noting that appellant met this description in both physical characteristics and attire, and further noticing that appellant was perspiring profusely, Bovino concluded appellant was most probably the offender. Appellant was handcuffed and credit cards in the complainant's name were seized and possibly his wallet.[3] He was then immediately transported to the Edmunds Street address, a distance of approximately one mile, for a show-up identification by that complainant. Following her identification, appellant was held in custody at a Metropolitan police station. Montgomery County police investigating the Silver Spring attack were notified and items of evidence seized from appellant were made available. The Montgomery County officers photographed both appellant and the two photographs recovered from his wallet.

Later that evening, the Maryland victim identified those photographs in connection with the attack she sustained on

---

1. The complainant was on the telephone with a friend when the assailant knocked on her door. The complainant answered the door and a man showed her pictures from his wallet and asked her to get him an address from the telephone directory. When she unlocked the door to give him the address, he pushed his way into her home. She was then beaten and choked with a cord placed around her neck.

2. The transcript of the dispatch was admitted into evidence at the suppression hearing but was not made a part of the record on appeal. We have quoted the dispatch from appellant's brief. The State does not dispute the contents of the dispatch as quoted.

3. There is some dispute about when appellant's wallet was seized. Officer Munro stated he believed it was seized by Officer Bovino at the time of appellant's arrest. Officer Bovino recalled that it was seized later at the police station.

September 28. Subsequently, on October 23, she identified appellant in a physical line-up conducted by the District police.

■ Appellant moved to suppress the victim's extrajudicial and in-court identifications and the photographs seized from his wallet.[4] The hearing judge ruled that when appellant was handcuffed and placed in the rear of the wagon on the corner of Cathedral Avenue and Bellevue Terrace on October 15, 1984, he was under arrest and that the arrest had been effected with probable cause.[5] Accordingly, the court denied the motion because the wallet was seized and the identifications were made incident to a lawful arrest.

■ Appellant asserts there was no probable cause to support the arrest at Cathedral Avenue and Bellevue Terrace and, therefore, the motion to suppress should have been granted. The first issue we consider is the application of the arrest jurisdiction's law to the question of probable cause. Since the arrest occurred in the District of Columbia, under the ruling in *Berigan v. State*, 2 Md.App. 666, 668, 236 A.2d 743 (1968), we apply that jurisdiction's "law" in testing the validity of the arrest. While the *Berigan* Court did not delineate what it meant when referring to the "law" of the arrest jurisdiction, the word "law" must refer to the particular statutes and constitutional provisions of that jurisdiction. Where those statutory and constitutional provisions are not in contravention of the United States Constitution, and to the extent that they expand an arrestee's rights, clearly those provisions control any decision concerning the validity of an arrest. If the word "law" in *Berigan* meant case law interpreting federal constitutional law, under the principles of federalism, a sister state's

---

4. Appellant also moved to suppress other evidence not relevant here.

5. Assuming the wallet was seized on the street, the scope of the search exceeded the permissible frisk for weapons under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). At this point we also note that we do not know whether the validity of this arrest has been adjudicated in the District of Columbia.

constitutional interpretation would not necessarily be binding in this State. Where, however, that sister state's interpretation is persuasive, as was the case in *Berigan*, a Maryland court may adopt that jurisdiction's analysis.

■ The Charter of the District of Columbia has no Fourth Amendment provision and its courts apply federal constitutional law to a probable cause analysis. Thus, we are not bound by its decisions. Since, however, we find the District of Columbia cases cited herein in accordance with our own interpretation of probable cause to support an arrest and more factually applicable, we follow the cue in *Berigan* and consider District of Columbia decisions on the issue.[6]

■ The next critical issue is whether, under the facts and circumstances of this case, the detention of appellant on the street was an arrest requiring the existence of probable cause, or an investigative stop justifiable on only articulable suspicion. We hold that it was the former. Under District of Columbia law, a person is arrested when there is a restriction of the right of locomotion or restraint of the person. *Price v. United States*, 119 A.2d 718, 719 (D.C. 1956). We agree with the hearing judge that appellant was arrested at the scene of his initial encounter with police immediately prior to being handcuffed and transported to the crime scene.

Having concluded that appellant was arrested rather than detained for an investigative stop, we must now determine whether probable cause existed to support the arrest. Certainly, a police officer, alone or in concert with others, may make a warrantless arrest for a felony committed in his or her presence, or out of his or her presence, if the officer has probable cause to believe a felony has been committed and the person arrested committed it. *Clemm v. United States*, 260 A.2d 687, 688 (D.C.1970). In *In the Matter of E.G.*, 482

---

**6.** Even if we cited our own Maryland decisions, our ultimate holding would remain the same.

A.2d 1243, 1246 (D.C.1984), the District of Columbia Court of Appeals reiterated the general rule for probable cause as follows:

> "Although '[t]here is no fixed formula for determining the existence of probable cause,' it has repeatedly been held to exist 'where "the facts and circumstances within [the officer's] knowledge, and of which [he] had reasonably trustworthy information, [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed.' " (Citations omitted. Brackets in original.)

The Court went on to quote from the Supreme Court's opinion in *Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949):

> " 'These long-prevailing standards ... seek to safeguard citizens from rash and unreasonable interference with privacy and from unfounded charges of crime. They also seek to give fair leeway for enforcing the law in the community's protection. Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability. The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law abiding citizens at the mercy of the officer's whim or caprice.' "

*In the Matter of E.G.,* 482 A.2d at 1246. "[T]he evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981).

Appellant concedes that Officers Munro and Bovino had probable cause to believe a felony had been committed

between 15 and 45 minutes before arresting appellant. The question is whether immediately prior to handcuffing appellant and seizing evidence from his person the officers had probable cause to believe that appellant committed the felony on Edmunds Street. Appellant asserts that there were no facts known to the police to support anything more than mere suspicion. We examine appellant's contentions individually.

## A.  Location

Appellant first argues that the officers had no reason to believe the suspect was in the "immediate vicinity" of Cathedral Avenue and Bellevue Terrace. To support this statement, appellant points out that neither officer knew the location of Edmunds Street. Appellant views the facts in a vacuum.

When the initial radio broadcast was dispatched at approximately 12:12 p.m. revealing a woman in distress on Edmunds Street, Officer Munro, according to his testimony, advised Officer Bovino of the broadcast and "told him I didn't know *exactly* where this street was located." (Emphasis supplied.) He stated that "as the crow flies" Edmunds Street was approximately three-fourths to one mile away. Officer Bovino similarly testified that when appellant approached the police wagon, he was on the radio attempting to get a lookout for the Edmunds Street robbery because the offense "occurred a short distance from there or a little bit away from there." He continued:

"... Officer Munro, when I got back to the wagon, asked me where Edmonds [sic] Street was, and I said, I don't know, *it's somewhere around here.*

\*        \*        \*        \*        \*        \*

*[I]t was in the area,* but I really wasn't sure because I wasn't familiar with that particular area." (Emphasis supplied.)

On cross-examination, he stated, "It's somewhere around here somewhere, but I'm not really sure *exactly* where it is." (Emphasis supplied.) Although the exact location of

the offense was not familiar to the officers, it is clear from their testimony that they had a general idea of its location and particularly its proximity to the locus of their encounter with appellant.

Appellant also contends that the officers did not have "the slightest clue as to the direction the robber may have taken or whether he left the scene on foot or in vehicle." While the officers did not know the direction of escape, appellant approached the police wagon, possibly within 15 minutes of the offense, and the officers stated there was little, if any, pedestrian traffic in the area where they encountered appellant.[7]

Since appellant was observed approximately one mile from the crime scene, a distance consistent with the elapsed time and within minutes after receipt of the initial broadcast, and was the only person observed in the area, the police could rely on the location of apprehension as a factor establishing probable cause to arrest.

## B. Suspect Description

Appellant next alleges that since the police had no reason to believe the suspect was in their immediate vicinity, (a conclusion we have rejected) their decision to arrest appellant was "based primarily, if not wholly, upon [Officer Bovino's] conclusion that the Appellant fit the description of the robbery suspect." Quoting our own case of *Cleveland v. State (Cleveland I)*, 8 Md.App. 204, 220, 259 A.2d 73 (1969), *cert. denied*, 257 Md. 732 (1970), *appealed on remand*, *(Cleveland II)*, 12 Md.App. 712, 280 A.2d 520, *cert. denied*, 263 Md. 711 (1971),[8] appellant suggests to us that the fact that the arresting officers concluded appellant fit the suspect's description " 'serve[d] no basis for a determination that a reasonably cautious person would be warrant-

---

7. Appellant was also walking in the direction away from 22nd and Q Streets—the location to which he suggested he was heading.

8. *Cleveland I* was reversed and remanded to the trial court for a new trial to establish a more sufficient record on the probable cause determination.

ed in a belief that the appellant fit the description.' " More specifically, appellant suggests Officer Bovino's conclusion that appellant fit the suspect description was insufficient because (1) the description was too general, (2) the officer failed to articulate his observations about appellant's physical characteristics, and (3) there was direct evidence that appellant's appearance was inconsistent with the suspect's description.

Appellant lifts the quotation from *Cleveland I* somewhat out of context and again views the facts available to the police with tunnel vision. We consider each of his allegations in turn.

### —Generality of Description—

Appellant posits that the broadcast description was too general and compares it to that found unacceptable in *People v. White,* 117 A.2d 127, 503 N.Y.S.2d 59, 63 (1986):

"[T]he description received by [police] was that of a black male, about six feet tall and weighing 180 pounds, and wearing a dark short-sleeve shirt and dark pants; the officer had no information regarding the suspect's age, build, hair style or other distinguishing physical characteristics."

We find the *White* case and appellant's reliance on it unavailing.

Initially, we note that if the New York Court were interpreting their own constitution, as it appears was the case,[9] then under *Berigan,* the *White* decision is inapplicable to a federal constitutional review. Moreover, a sister state's case law is not binding in the District of Columbia or Maryland in general, and particularly when there is a sufficiently developed body of law on the subject in that jurisdiction as well as ours. With respect to the actual description broadcast in the case *sub judice* in comparison to that given

---

9. While the Fourth Amendment was referred to, the New York Supreme Court, Appellate Division, specifically cited to that State's constitutional provision implicating probable cause to arrest. *People v. White,* 117 A.2d 127, 503 N.Y.S.2d 59, 62 (1986).

in *White*, the officers did have specific information about the suspect's age—a "distinguishing physical characteristic" absent in *White*. Moreover, *White* involved accosting a defendant in a crowded Brooklyn, New York, subway station in late rush hour. In the case at bar, the officers testified appellant was the only pedestrian they spotted in the area.

Further, we cannot conclude that the description given in the case *sub judice* was as general as the one reported in *Cleveland I*. The description given by the District complainant included observable distinguishing characteristics such as race, sex, age, height, weight, and clothing with some detail. We find the cited case of *Cleveland I* factually distinguishable. In that case, the only description of a robbery suspect acted upon was that of "a negro male approximately six feet." 8 Md.App. at 214, 259 A.2d 73. This Court stated:

"The arresting officer testified that his attention was attracted to [Cleveland] because he fit the description given by the Sheriff and he described the man he saw as appearing to be 'five feet eleven' and having on 'a dark jacket, dark pants.' But this conclusion by the officer that [Cleveland] fit the description given by the Sheriff serves no basis for a determination that a reasonably cautious person would be warranted in a belief that [Cleveland] fit the description. We cannot speculate that the officer received a description that the robber ... was five feet eleven inches in height and was wearing a dark jacket and dark pants, even if such description could be deemed to show a probability that the man observed was the robber in the circumstances."

8 Md.App. at 220, 259 A.2d 73. On retrial, the arresting officer testified that he received a telephone call from the sheriff informing him of the robbery and the robber's description: " 'colored male, approximately 5 feet 11 to 6 feet tall, 175 to 80 pounds. He was dressed in a dark jacket, dark pants and a cap, a light tan colored cap.' " 12 Md.App. at 714, 280 A.2d 520. We then ruled that the

missing ingredients from *Cleveland I* with respect to probable cause had been supplied in the second case. The description given by the District of Columbia complainant in the case *sub judice* simply does not mirror the vague description given in *Cleveland I.* In fact, the description is as specific as that found acceptable in *Cleveland II.*

We cannot help but believe that what appellant is actually complaining about is that the District of Columbia complainant did not depict her assailant with an artist's eye for details. As the hearing testimony revealed, she was knocked down, beaten and choked until she lost consciousness. While she may not have given as detailed a description as one normally trained in observation, such as a police officer, given the circumstances to which she was subjected, we find the description the District complainant gave more than adequate. To this point, we quote from the District of Columbia Court of Appeals in *Carey v. United States,* 377 A.2d 40, 46, 47 (D.C.1977):

> "[T]he victim[ ] was understandably in an agitated state throughout the immediate post-offense events and [her] powers of totally accurate recall or repetition of details may not have been optimal.
>
> \*   \*   \*   \*   \*   \*
>
> "We note that a crime victim's observation may be faulty in some respects but the mistakes are irrelevant if there is sufficient particularized information and circumstances to constitute probable cause as to identity."

### —Articulation of Description—

Appellant also alleges that Officer Bovino failed to articulate his specific observations regarding appellant's physical characteristics. It is true the officer did not directly articulate his observations. He did, however, indirectly describe how appellant matched the suspect description. Bovino stated that after receiving the lookout, he observed that appellant "did fit the lookout . . . [t]he leather jacket, I believe the pants fit. You know, the general physical description fit as well." In response to inquiry, Bovino

indicated in the affirmative that appellant fit "the racial, height, [and] weight characteristics[.]" An affirmative answer to a posed question for evidentiary purposes is the same as if the witness articulated the statement in the first instance. Thus, appellant is simply incorrect when he maintains that

> "[w]hatever limited significance an observed and articulated correspondence of the suspect's and arrestee's general physical characteristics may have as a supporting factor in establishing probable cause is of little consequence in the instant case, since the arresting officer failed to articulate such correspondence."

### —Inconsistent Description—

Appellant concedes that "the limited significance of a correspondence between the general physical description of the suspect and arrestee may be enhanced by incremental correspondence of attire." Appellant states, however, that in the case *sub judice*, the evidence revealed inconsistencies between his wearing apparel and that of the suspect. We are referred to *Cleveland II* for a case in comparison.

In *Cleveland II*, as we stated, testimony was adduced that the hold-up suspect was " 'dressed in a dark jacket, dark pants, and wore a cap. Light tan colored cap.' " 12 Md.App. at 720, 280 A.2d 520. The arresting officer, after receiving this description, observed Cleveland "dressed in a dark jacket, dark pants, with a tan cap on . . . ." 12 Md.App. at 720, 280 A.2d 520. Appellant contrasts the "exact matching" of the "description of three items of apparel worn by the suspect and the officer's specific articulation of the items worn by [Cleveland]" in *Cleveland II* with the testimony of Officers Bovino and Munro. He suggests that only a single item of clothing matched and thus the probability that appellant committed the robbery was "substantially" decreased. Our review of the officers' testimony demonstrates appellant's perspective of the facts is skewed.

The radio lookout received by Officers Munro and Bovino described the suspect in part as

"[w]earing a dark leather jacket. The complainant *believes it might have been* black. She states he also wore *she believes* blue jeans." (Emphasis supplied.)

On direct examination, Officer Munro described appellant's attire as follows:

"He had a dark coat on, like a leather coat, waist length. He had dark, I believe, blue shirt on, and he had gray pants.

> \*　　\*　　\*　　\*　　\*　　\*

[I]t *looked like* gray pants." (Emphasis supplied.)

On cross-examination, Munro stated he believed the notes he took the day of the arrest indicated appellant's pants were "pinstripe." [10]

Officer Bovino, when asked to explain in what ways appellant matched the suspect's description, stated with respect to attire that appellant "did fit the lookout ... [t]he leather jacket, *I believe* the pants fit." (Emphasis supplied.) Upon inquiry by appellant's counsel, the following colloquy occurred:

"Q.　... Do you recollect today what he was wearing back then?

"A.　Oh. It was a dark leather jacket and dark—dark pants...."

Appellant suggests the evidence indicated a correspondence of only the jacket—an item "that lacked any observed distinctive features"—and a "clear conflict" as to the only other garment included in the suspect's description. We disagree with appellant's characterizations.

There no doubt was a match between the jacket appellant was wearing at the time of his arrest with that of the

---

**10.** The notes were marked as an exhibit but were never introduced into evidence. This Court will never know if the report made contemporaneously with the arrest provided more accurate or detailed information to support the officers' probable cause determination.

described jacket, both in terms of darkness and material.[11] Contrary to appellant's suggestion, we perceive the identification of leather material to be exactly an "observed distinctive feature." [12]

With respect to the trousers described in the broadcast, we cannot overlook that the District complainant stated she "believes" her assailant wore blue jeans. Thus, the fact that her description was not conclusive has some bearing on how the police officers who received the broadcast processed that information. Both Officers Munro and Bovino recalled appellant's trousers with the same degree of tentativeness—that is, Officer Munro thought appellant's trousers "looked like" gray, possibly pinstripe pants. Similarly, Officer Bovino stated he "believe[d] the pants fit" the description. He subsequently stated the trousers were "dark pants." There is nothing grossly inconsistent between the three descriptions. They were simply similar generalizations based on perceptions.

Probable cause, as we stated, is grounded in probabilities. When dealing with descriptions and identifications made in the context of a criminal episode, the probabilities necessarily turn on perceptions of the various actors. What is perceived as gray to one person may be perceived as blue to another individual [13] (based on lighting conditions, ability to

---

**11.** The Maryland victim in the case *sub judice* also identified the jacket as the one worn by her attacker.

**12.** Appellant cites to Officer Munro's testimony to establish that he did not observe anything distinctive about the jacket. As the testimony makes clear, *other* than the fact that it was leather, he did not recollect any distinguishing features:

"Q Could you describe for us, please, the dark coat, leather, waist-length that you observed [appellant] wearing.

"A It was waist-length, dark. It looked like a leather coat.

"Q Did it have any distinguishing features about it *other* than what you have described to us just now?

"A No." (Emphasis supplied.)

**13.** For example, Officer Munro stated appellant was wearing a blue shirt at the time of the arrest and Officer Bovino said he thought the

observe, reason for observation, innate ability to identify colors, purity of color, degree of attentiveness, texture, memory ability), and merely because there is a difference in perception does not mean the difference is fatal. It is an element that goes to the probability of a certain fact being true.

In *Brown v. United States*, 365 F.2d 976 (D.C.Cir.1966), cited with approval in *Carey*, 377 A.2d at 46, 47, the United States Court of Appeals upheld a search incident to an arrest where there were numerous discrepancies between the lookout description and the individual arrested. In that case, the robbery suspect was described as a black male of heavy build, five feet five inches, wearing a brown jacket and a cream-colored straw hat, driving a 1954 maroon Ford. When apprehended, Brown was five feet eleven inches, wearing blue, had a felt hat in the car, and the car was a 1952 automobile. The Court noted that

"[t]hese discrepancies, which can be the result of the victim's excitement or poor visibility or of the suspect's changing clothes, did not destroy the ascertainment made on the basis of the accurate portion of the identification, which was by itself enough to constitute probable cause, that [Brown] was the one sought.

\*    \*    \*    \*    \*    \*

[Brown] and his car thus *reasonably* matched the description received." (Emphasis supplied.)

*Brown*, 365 F.2d at 978. Likewise, appellant more than "reasonably matched the description received[,]" despite the slight discrepancy with respect to the trousers color. Given the tentativeness of the complainant's description, coupled with the circumstances surrounding her identification, the officers could reasonably conclude that the suspect's pants generally matched those worn by appellant in terms of length (full length rather than short) and in terms of a dark-colored material. Thus, there is not a "clear" conflict

---

shirt was white or gray. The District complainant did not even venture a guess as to her assailant's shirt color.

with respect to the consistency of the descriptions of the trousers, and appellant's attire in all material respects matched those worn by the suspect.

## C.   Additional Factors

Appellant points to three additional factors in the inventory of police information—the observation that appellant was sweating profusely, the absence of suspicious behavior on appellant's part, and the racial make-up of the arrest area— and argues these factors do not amount to anything more than suspicion.   As to the first factor, we conclude it had some bearing on the probability of appellant's participation in the crime.   With respect to the second factor, we determine that it does not emasculate to any degree the other information known or observed by the officers.   We dismiss the third factor because the evidence clearly demonstrates that demographics played no part in the officers' decision to arrest appellant.

### —Observation of Perspiration—

Appellant posits that "[t]he fact that [he] was sweating profusely could generate no more than mere speculation that it was related to flight from the scene of the robbery." The officers testified that they both initially observed that appellant was sweating profusely.   Obviously, the amount of perspiration was of such quantity as to trigger some degree of suspicion and of such an amount as to be remembered by both officers over one-and-one-half years later at the suppression hearing.   This perception was further enhanced by the fact that the temperature was only between 60 and 70 degrees the day of appellant's arrest and by the fact that, according to testimony, the officers were not perspiring.   Although the observation of perspiration alone would not support a probable cause determination, when coupled with the fact that the arrestee is located in close proximity, both temporally and geographically, to the crime scene, and coupled with the fact of a correspondence between the suspect's and the arrestee's description, it substantially contributed to a finding of probable cause.

 

## —Suspicious Behavior—

■ Appellant next asserts that any suspicions aroused in the officers' minds "was substantially attenuated not only by the absence of suspicious conduct, but by the very antithesis of such conduct, to wit, engaging the police, turning to them for a kind of assistance that law-abiding citizens routinely seek from police officers."

This exact line of argument was rejected in *Carey*, 377 A.2d at 46–47, where the District of Columbia Court of Appeals stated:

"[Carey] makes much of the fact that his group was not acting in a suspicious manner. While suspicious actions will contribute to probable cause, their absence, under the circumstances, is at most neutral and certainly does not detract therefrom."

Appellant also criticizes the police for not questioning him in an attempt to evoke evasive or suspicious responses which could have supported a probable cause determination. To substantiate his position, appellant cites to yet another New York case, *People v. Riddick*, 110 A.D.2d 787, 487 N.Y.S.2d 855, 856–57 (1985), and quotes:

" 'The fact that defendant and his companion fit the meager, general description of the perpetrators was insufficient, without more, to establish probable cause to arrest them.... *No inquiry was made which might have added information to the officers' mere suspicion that the two men were the perpetrators they sought.* Thus, the facts failed to satisfy the requirements for probable cause.' " (Emphasis added by appellant.)

It bears repeating that the cases of foreign jurisdictions ruling on the presence or absence of probable cause are not necessarily controlling in the sister states. Moreover, the descriptions given in *Riddick* were less comprehensive than that given in our case, and in contrast to the case at bar there was no indication that the men were arrested near the crime scene and close to the time of the offense.

Finally, while a question-and-answer period by the officers with appellant may have generated additional information making it even more likely that appellant committed the offense, there is no requirement that before arrest, the police must negate every possibility that the individual accosted is innocent of the alleged felony. *See Crawford v. United States,* 369 A.2d 595, 601 (D.C.1977). On-the-street encounters which require expeditious police action do not always lend themselves to exhaustive inquisitions. This is not to say that in a given case, police inquiry of a suspected felon would not be recommended. We are only prepared to say that it was not necessary in this case. The officers had sufficient probable cause to arrest without the necessity for questioning appellant prior to his arrest.

### —Demographics—

■ Citing *Alfred v. State,* 61 Md.App. 647, 657, 487 A.2d 1228 (1985), appellant concedes "[d]emographic information '[could] have some bearing on the probabilities' regarding the basis for an investigatory stop." Appellant then asserts that the officers could not properly rely on the racial homogeneity of the area in which appellant was encountered as a factor contributing to probable cause. As appellant suggests, "[i]f undue weight is accorded this factor, there is the considerable danger ethnic or racially homogeneous neighborhoods will be converted into Fourth Amendment war zones for minorities, whose presence therein will place them at risk, stripped of the Fourth Amendment protection available to the rest of the citizenry."

While appellant's point is well-taken, the application of this principle is irrelevant in the case *sub judice.* The hearing testimony evinces that neither officer expressly nor indirectly articulated the significance attached to appellant's presence in the neighborhood, nor did either state that demographics was a fact considered in the decision to take

appellant into custody.[14] Accordingly, appellant's alleged racial incompatibility with the area is irrelevant to our review of the presence or absence of probable cause.

While not surprisingly omitted by appellant, the evidence adduced at the suppression hearing supported several additional factors bearing on the finding of probable cause. Officer Munro had been a member of the Metropolitan Police Department for over 15½ years and Officer Bovino was an 11–year veteran at the time they encountered appellant. Thus, the overall experience these men possessed in the course of apprehending criminals cannot be factored out with respect to their conclusion that appellant committed the Edmunds Street felony. *See Clarke v. United States,* 256 A.2d 782, 785 (D.C.1969). Additionally, while appellant's behavior in asking for directions may not have been suspicious, it was consistent with the conclusion that appellant was not from around the area and, in fact, he was walking away from the direction of 22nd and Q Streets. *See Wilkerson v. United States,* 427 A.2d 923, 924 (D.C.), *cert. denied,* 454 U.S. 852, 102 S.Ct. 295, 70 L.Ed.2d 143 (1981) (arresting officer noted that defendant was not walking in the direction of place where he stated he was going and in fact had walked passed the street leading to the most direct route). Finally, had the police waited for more additional or detailed information before arresting appellant, the suspect's identity may never have been determined. "The exigencies of the situation made the course of action imperative. 'The emergency character of these arrests weighs heavily in determining their reasonableness.' " *Carey,* 377 A.2d at 47, quoting *Bailey v. United States,* 389 F.2d 305, 309 (D.C.Cir.1967).

---

**14.** The State questioned both officers about the racial composition of the area, but did not direct either officer to state how demographics affected their probable cause decision. Neither the State nor appellant raised the issue of demographics in their arguments at the hearing. The allegedly impermissible use of a racial factor was first introduced on appeal by appellant.

In conclusion, recognizing the fact that we are dealing with "probabilities deduced from a set of circumstances taken in combination, not singly," *Heard v. United States,* 197 A.2d 850, 851 (D.C.1964), we think the observations of the officers, coupled with the information they possessed, rose to the level of probable cause to support appellant's arrest. To borrow from our own Court, we quote Judge Moylan:

"[E]ach observation, standing alone, may well have been innocuous. That, of course, is beside the point. That each fragment of a mosaic, viewed alone, is meaningless by no means implies that the mosaic itself is without meaning. This is one of those instances where the whole is, indeed, greater than the sum of its parts."

*Malcolm v. State,* 70 Md.App. 426, 435, 521 A.2d 796 (1987).

Accordingly, the court properly denied appellant's suppression motion and any evidence seized or identifications made were incident to a lawful arrest.

## II. FINGERPRINT EVIDENCE

Appellant also contends that the trial court abused its discretion in limiting the sanction it imposed for a discovery violation. We do not agree.

At trial, appellant asserted that he had been denied discovery of a fingerprint examination done by the State's expert witness. Originally, in discovery, appellant had been given a fingerprint analysis which indicated that a latent print lifted from outside the Maryland victim's apartment matched a card with appellant's fingerprints. The State, however, could not identify the police officer who had taken appellant's prints from this card. Realizing the absence of this crucial witness, the State obtained a second set of appellant's prints and at trial attempted to submit the second set of prints to the State's expert for a second comparison. Appellant objected alleging that neither the fact that he had provided the State with a second set of

prints nor the result of the second print comparison were provided to him in discovery.

The court agreed there had been some violation, but denied appellant's request that the fingerprint expert be excluded from testifying at trial in any manner. The court ruled that the introduction of the second comparison would be excluded, but the expert was permitted to reexamine the exhibits and testify to the results because the defense knew from discovery that the State intended to rely on fingerprint evidence.

■ Appellant argues that "the apparent sanction was no sanction. The resolution was inherently and implicitly self-contradictory and simply reflected an equivocation in the extreme[.]" At the same time, appellant concedes that whether any and what type of sanction is to be imposed for a discovery violation is committed to the sound discretion of the trial judge. Rule 4–263; *Warrick v. State,* 302 Md. 162, 173, 486 A.2d 189 (1985). That discretion was not abused in this case.

Appellant's experienced trial counsel had no reason not to expect that the State would attempt to remedy at trial any evidentiary infirmities apparent in the first fingerprint analysis. Moreover, appellant's counsel was permitted time to converse with the State's expert after he conducted his analysis [15] and before he took the stand to testify to the results.

■ Even if we were to say the expert's testimony should have been excluded, the introduction of the results was harmless beyond a reasonable doubt. *Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665 (1976). The Maryland victim had previously testified that she identified appellant in a line-up, she had identified him from a photograph, she identified the leather jacket he was wearing at the time of his arrest, and she had made an in-court identification of him. The fingerprint match merely substantiated her iden-

---

**15.** The second analysis reflected a matching of prints.

tifications. Thus, denial of the requested relief was not prejudicial and did not deny appellant a fair trial.

JUDGMENTS AFFIRMED.

COSTS TO BE PAID BY APPELLANT.

ROBERT M. BELL, Judge, dissenting.

As a threshold matter, I wish to make clear that I agree with that portion of part 1 of the majority opinion in which the State's argument that appellant's arrest, in this case, may be justified on the basis of an investigative stop, which blossomed into an arrest on probable cause upon the appellant's identification by the Washington, D.C. victim, was rejected. If the effect of that rejection were to render premature the fears I expressed in my dissenting opinion in *Farrow v. State*, 68 Md.App. 519, 514 A.2d 35 (1986), *cert. denied*, 308 Md. 382, 519 A.2d 1283 (1987)—that the general rule requiring probable cause for arrest is being swallowed by the exception permitting an investigative stop upon reasonable suspicion—I would applaud it. I do not do so, however, because, immediately after rejecting the State's argument, the majority proceeds to find, on the facts of this case, that probable cause exists. It thus has dealt the concept of probable cause another devastating blow, one that is at least equal to, if it does not exceed, the intensity of the one struck by *Malcolm v. State*, 70 Md.App. 426, 52 A.2d 796 (1987) and, in effect, has continued the evisceration of the vitality of the concept. I have an irreconcilable disagreement with this holding.

Probable cause is a "non-technical conception of a reasonable ground for belief of guilt ... but more evidence than would arouse a mere suspicion." *Johnson v. State*, 8 Md.App. 187, 191, 259 A.2d 97 (1969). *See Parker v. State*, 66 Md.App. 1, 7, 502 A.2d 510 (1986). As such, probable cause requires less evidentiary justification than proof beyond a reasonable doubt, but more than a reasonable "articulable suspicion." *See Watkins v. State*, 288 Md. 597, 606, 420 A.2d 270 (1980). Probable cause exists if the facts and

circumstances known to the officer, derived from either personal observations or reasonably trustworthy information, warrant a reasonably cautious person in believing that a felony has been committed and that the person arrested committed it. *Edwardsen v. State,* 231 Md. 332, 336, 190 A.2d 84 (1963); *Mulcahy v. State,* 221 Md. 413, 421, 158 A.2d 80 (1960). It's existence must be determined "from the viewpoint of a prudent and cautious police officer on the scene at the time of the arrest [and t]he question to be answered is whether such an officer in the particular circumstances, conditioned by his observations and information, and guided by the whole of his police experience, reasonably could have believed that a crime had been committed by the person to be arrested...." *Parker,* 66 Md.App. at 8, 502 A.2d 510, quoting *Patterson v. United States,* 301 A.2d 67, 69 (D.C.1973). The test of the existence or non-existence of probable cause is an objective one. *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968).

It is important to consider what the officers knew at the moment of arrest, which occurred at approximately 12:21 p.m. They were aware that: a crime had been committed between 11:30 a.m. and 12:00 noon; the person committing the crime was described by the victim as:

[A] black male. In his 20's. 5—ft. 8. 180 lbs. Wearing a dark leather jacket.

The complainant believes it might have been black. She states that he also wore she believes blue jeans;

when appellant was seen shortly before he was arrested, walking in a white upperclass neighborhood, in which there was little pedestrian traffic, he was wearing a dark leather jacket and gray or gray pinstripe trousers;[1] and appellant

1. One of the officers testified that appellant's pants were "dark". The other officer, who wrote a report of the arrest, testified that appellant's pants were gray and acknowledged that his report indicated that appellant wore "pinstripe" pants. Despite the testimony, the majority inexplicably asserts that "This Court will never know if the report made contemporaneous with the arrest provided more accurate or

was perspiring profusely on a day on which the temperature was between 60 and 70 degrees.

Of equal importance is what the officers did not know. They did not know, except in the most general terms, where the crime scene was in relation to the area in which appellant was observed and arrested. The record reflects that the officers surmised that Edmonds Street is "somewhere around here", but neither knew exactly where it was and neither was "familiar with that particular area." Thus, it is obvious that the officers had no idea whether appellant was walking in the direction of, or away from, the crime scene. Finally, the officers did not know from where appellant was coming, nor how far he had travelled.

Additional facts must also be considered. Appellant was not observed to do anything suspicious; on the contrary, he approached the officers to ask for directions. Other than the approximate temperature of that day, the record disclosed no information which would have tended to explain appellant's perspiring or from which one could conclude that the fact that appellant was perspiring was a significant observation tending to support the existence of probable cause.

The greater the extent to which there is correspondence between the description of the criminal actor and the person accosted and the closer the proximity of the place of accosting, both in terms of time and distance, to the crime scene, the stronger the cause for believing that there is a connection between the crime and the person accosted. *Cleveland v. State*, 8 Md.App. 204, 259 A.2d 73 (1969) (*Cleveland* I) and *Cleveland v. State*, 12 Md.App. 712, 280 A.2d 520 (1971), (*Cleveland* II) are illustrative.

In *Cleveland* I, the State had failed, at trial, to present evidence with respect to the "information upon which the arresting officer acted." 8 Md.App. at 222, 259 A.2d 73.

---

detailed information to support the officer's probable cause determination".

We explained why the evidence before the trial court was insufficient to demonstrate that the arresting officer had probable cause, in part, as follows:

We cannot say that the information shown to have been within the knowledge of the arresting officer established probable cause to believe that the appellant was the robber. Nor is the deficiency in the evidence supplied by facts and circumstances within the personal knowledge of the officer. The time which elapsed between the commission of the robbery and the observation of the appellant by the arresting officer was not established, although it apparently was of relatively short duration. The distance from the scene of the crime and the place where the arresting officer observed the appellant was not stated in the testimony, although apparently it was somewhere in the proximate vicinity.

8 Md.App. at 221, 259 A.2d 73. We had previously noted the absence of any testimony concerning the description of the suspect given to the officer. 8 Md.App. at 220, 259 A.2d 73. The defects in the evidence having been cured at Cleveland's retrial, in *Cleveland* II, we affirmed the trial court's finding of probable cause, explaining:

Sergeant Boulter, at the time of the arrest of the Appellant, at a site within one-half mile of the holdup and within moments of its occurrence, was relying on trustworthy information from the Sheriff that a felony had been committed. *His observation of the Appellant's height, weight, "rapid gait and furtive manner" and wearing apparel, which matched that contained in the description of the robber, gave rise to reasonable grounds, beyond mere suspicion, for belief that the Appellant was the person who committed the robbery.* (emphasis added)

12 Md.App. at 721, 280 A.2d 520.

The converse, of course, is true also: the greater the lack of correspondence between the description of the criminal actor and the accosted person and the further removed, in time and space, the place of accosting is from the scene of

the crime, the weaker the cause for finding a connection between the person accosted and the crime. In this regard, it is also important to note that circumstances existing at the time of the accosting which support or negate such a connection must also be considered. The surrounding circumstances must be such as to make reasonable the inference that the person accosted committed the crime under investigation. Therefore, whether the person accosted, before, at, or after, the accosting, behaves in a suspicious manner is significant in assessing the reasonableness of the officers' belief.

Turning to the instant case, it must be conceded that appellant met the general, non-specific description contained in the lookout broadcast. This, along with the facts that appellant's clothing corresponded to the lookout broadcast clothing description in one particular and appellant was arrested at a location which the police believed to be generally in the area of the crime scene, justifiably and reasonably aroused the officers' suspicions; the information did not, however, amount to probable cause for arrest. This is true because of the discrepancy between the clothing worn by appellant and that worn by the criminal actor and the inability of the officers, because of their lack of specific knowledge concerning the location of the crime scene in relationship to the place of arrest, to reasonably relate appellant's presence at the place of arrest to the crime reported. When these factors are considered, the circumstances simply do not justify anything other than suspicion, reasonable though it may be, that appellant may have committed the crime.

The majority does not dispute the generality of the officers' information concerning the crime scene's location vis-a-vis the place of arrest; it says, however, that "[s]ince appellant was observed approximately one mile from the crime scene, a distance consistent with the elapsed time and

within minutes after receipt of the initial broadcast[2] and was the only person observed in the area, the police could rely on the location of apprehension as a factor establishing probable cause to arrest." At the outset, it must be observed that the majority's conclusion that the distance between the crime scene and the place of arrest was consistent with the elapsed time was, like its statement of the distance, based upon an after the fact determination. When appellant was arrested, neither officer knew the distance to Edmonds Street; consequently, they could not have known whether the elapsed time was consistent. Furthermore, "within minutes after receipt of the initial broadcast" refers to a time frame closer to 20 to 21 minutes, than to 15.[3] The most serious problem with the majority's analysis, however, is its failure to recognize that probable cause demands that some connection be shown between the presence of a person at a particular place, at a particular time, and the crime under investigation. The fact that appellant was at the place where he was arrested within a short time after a crime had been committed is of no consequence unless and until there is a reasonable basis for believing that it would have been unusual for him to be there otherwise *or* that the circumstances surrounding his being there give rise to a reasonable belief that his being there is connected with the crime.

Appellant was arrested at just before 12:30 in the afternoon in a section of Washington, D.C., a city with a large black population, including black males, within a relatively short distance of major intersections, a hospital, a public

---

**2.** The majority speculates that appellant was in the area "possibly within 15 minutes of the crime."

**3.** The initial broadcast, made at 12:12 p.m., indicated that the offense occurred between 11:30 a.m. and 12:00 noon. The second broadcast, was received, upon one of the officer's request, at 12:21 p.m., shortly after appellant had been seen and had approached the officers for directions. Appellant was arrested shortly after 12:21. Thus, it would appear that appellant was seen in the area shortly before 12:21, a period some nine minutes after the first broadcast, and 20 to 21 minutes after the latest time at which the offense could have occurred.

park, and a bus stop. It cannot be said that it was unusual for appellant to be at the place where he was arrested; the fact that he was there at a time when there was little pedestrian traffic does not make it so. Nor does that fact suggest, or, in any way, supply a basis for a reasonable belief, that appellant committed a crime. And the circumstances surrounding appellant's presence did not connect him with the crime. As pointed out above, the officers did not have sufficient information concerning the location of the crime scene, from which it could be inferred that appellant was coming from the area of the crime. It is interesting to note, in that regard, that the record does not reveal, even after the fact, whether the direction in which appellant was traveling was significant from the standpoint of the crime scene.[4] Moreover, there was a discrepancy between the clothing description broadcast in the lookout and the clothing worn by appellant. Therefore, the necessary nexus was not established by reference to that factor.

The victim described the trousers worn by her assailant as "blue jeans". The trousers worn by appellant were variously described as dark or gray or gray pinstripe;[5] they were not described as "jeans". Whether the victim used the term "blue jeans" generically, to refer to a class of leisure trousers so popular these days, or descriptively, to refer only to color, there was a significant discrepancy which cannot be ignored between her description of her assailant's trousers and the trousers worn by appellant. While an inference that appellant committed the crime could reasonably have been drawn had appellant met both the

---

4. The majority comments, in note 7, that appellant sought directions as to how to get to 22nd and Q Streets, a location in the opposite direction to that in which he was traveling. Although, as its comment suggests, the majority may view appellant's actions as somehow unusual, I do not; indeed, it would appear that the fact that he was walking away from the direction in which he wanted to go is indicative of the reasonableness of his request for directions.

5. *See* n. 1.

general physical description [6] and the clothing description in the warrant, a discrepancy in an item of clothing substantially dilutes the reasonableness of such an inference.

The majority, while acknowledging an inconsistency between the lookout description of the assailant's trousers and the trousers worn by appellant, concludes that the inconsistency is not "grossly inconsistent" and that the lack of certainty, on the part of the victim as to whether her assailant was wearing "blue jeans" has "some bearing on how the police officers who received the broadcast processed that information." It perceives any inconsistency between the broadcast description and that related by the officers as generalizations based on perceptions, which are "an element that goes to the probability of a certain fact being true."

It thus appears that the test of probable cause that the majority applies in analyzing the clothing discrepancy is largely a subjective one: it seems to suggest that since it is the perception of the observer that is important, the observer's subjective belief that what he observes corresponds to the information he received is dispositive. That simply is not the case. The test of probable cause is an objective one. It is not the police officers' perception of what the victim meant, but what the victim said, objectively viewed, that is controlling and which must be compared, again objectively, with what the officers observed. This is precisely the reason that the circumstances surrounding an arrest, which bear on the reasonableness of police action, must play an important part in determining the existence of probable

---

**6.** I submit that it is significantly more important, for probable cause purposes, that the clothing description match the clothing worn by the suspect than that the general physical descriptions match. In the ordinary case, a clothing description will be met by a much smaller number of persons in a given area than will a general physical description. And the more specific the clothing description, the less likely it is that there will be multiple matches. In the case of physical description, however, multiple matches are a distinct and real possibility except in the case of the most specific and exact physical description.

cause. The officer's perceptions, particularly where they are inconsistent with the objective information provided by the victim, simply do not suffice.

The majority relies on *Brown v. United States,* 365 F.2d 976 (D.C.Cir.1966) for the proposition that "... discrepancies, which can be the result of the victim's excitement or poor visibility or of the suspect's changing clothes, [do] not destroy the ascertainment made on the basis of the accurate portion of the identification, which was by itself enough to constitute probable cause." *Id.,* 365 F.2d at 978. I agree with the holding, but find it inapposite to the facts *sub judice.* Unlike here, in *Brown,* the Court found probable cause because:

> The first officer who heard the "lookout" over the radio acted on the part that said a Negro male of heavy build in a maroon 1954 Ford had just robbed the Howard Johnson on Virginia Ave. This information was sufficiently particular to lead the officers directly to the suspect.... The total number of 1954 Fords meeting that description being driven in 1964 was limited; still smaller was the total number being driven at 4:30 on a Monday morning, and yet smaller those driven in that immediate neighborhood at that time by heavy Negro males. Ordinary human experience alone, without resort to the precise factors of the law of probability, tells us this. (Footnotes and citations omitted),

and

> The information received by the police was that the suspect was driving a 1954 maroon Ford; it turned out at trial that it was a 1952 car. One of the arresting officers testified that he thought Appellant was driving a 1952 or 1953 or 1954 Ford and that these model years were all pretty much identical to him. What they properly looked for—and found—was an "old" maroon Ford car. Appellant and his car thus reasonably matched the description received.

*Id.* In a footnote, the Court pointed out that the officers followed the car "for several blocks travelling in a direction

leading away from the location of the Howard Johnson." *Id.* The situation here is far different.

The State proffers that two additional factors, *i.e.,* the demographics of the area in which appellant was arrested and the fact that when first observed, appellant was perspiring profusely, buttress its conclusion that the trial court's probable cause determination was correct. The majority adopts one of those two factors as "substantially contribut[ing] to a finding of probable cause." [7] I find neither factor to have any value in this case.

While the demographics of an area may have some bearing on probable cause, *see Alfred v. State,* 61 Md.App. 647, 656–57, 487 A.2d 1228 (1985), as the majority correctly observes, this effect has not been shown in this case. Aside from the majority's rationale—that the officers did not rely on demographic evidence—I posit that the facts and circumstances of this case would not have justified its use even had the officers relied on it. The evidence on the issue is not complete. Furthermore, since the arrest occurred in the nation's capitol, a city with a population in excess of 50 percent black, in an area in which it is not unusual to see black persons, the demographics of the area could not have any significance. In any event, in appellant's words:

> If undue weight is accorded this factor, there is the considerable danger ethnic or racially homogenous neighborhoods would be converted into Fourth Amendment war zones for minorities, whose presence therein will place them at risk, stripped of the Fourth Amendment protection available to the rest of the citizenry.

The second factor that the State posits, and the majority accepts, as supportive of probable cause, is the fact that appellant, when first observed, was perspiring profusely. Other than this observation, the police point to nothing

---

7. The majority discusses these factors as if they were suggested by appellant. Although he discusses them in an effort to persuade us of their inapplicability, in point of fact, appellant relies only on the lack of any suspicious behavior on his part as tending to negate the existence of probable cause.

unusual about appellant or his demeanor. Perspiring, even profusely, on a public street, in 60–70 degree weather, is not, in and of itself, a circumstance which leads inevitably, or even reasonably, to the conclusion that the person perspiring has been engaged in criminal activity. Persons, even innocent ones, perspire for a variety of reasons unrelated to criminal activity; even honest exertions of energy, including walking, may cause one to perspire. In this regard, it must also be considered that a temperature of between 60 and 70 degrees is not exactly frigid and may even be quite warm depending upon other factors, such as humidity, the amount of sunshine, and the weight of the clothing being worn. It is patent, therefore, that this factor, in the absence of observations tending to negate, or bring into question, its innocence, adds nothing of value to the probable cause inquiry.

In my view, the absence of any evidence of suspicious behavior on the part of appellant is extremely important in this case. The presence of suspicious behavior would have been a circumstance from which the officers could reasonably have inferred a connection between appellant and the crime. Without its presence, for the reasons previously given, no such inference is possible. *Carey v. United States*, 377 A.2d 40 (D.C.App.1977) is not to the contrary. There, the reliability of a description of criminal suspects, broadcast by the police, was questioned because it was arguably inconsistent with a prior description given by the victim. Except for the age factor, the suspects met the broadcast description. The Court refused to consider the discrepancy between the descriptions. It was in this context that the court made the remarks attributed to it on p. 20 of the majority opinion. When, as here, there is no such exact correspondence between the description broadcast and the persons arrested, reference to other circumstances, including the absence of any observations of suspicious behavior, becomes important.

The information possessed by the officers did not rise to the level of probable cause. They only had cause to be

reasonably suspicious. Perhaps their suspicions could have blossomed into probable cause had they conducted an investigation on the scene; perhaps, questioning appellant would have elicited suspicious responses or behavior sufficient to elevate their suspicions to probable cause. The officers did not choose to conduct an investigation prior to appellant's arrest and an appellate court may not speculate as to what such an investigation might have revealed.

I submit that appellant's arrest, being unsupported by probable cause, was illegal. I dissent.